

Villanova University School of Law Digital Repository

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-23-2007

# McCabe v. Ernst Young

Precedential or Non-Precedential: Precedential

Docket No. 06-1318

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"McCabe v. Ernst Young" (2007). *2007 Decisions.* Paper 648.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/648

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1318

_____

DANIEL McCABE;
RUSSELL E. McCABE; DAVID MOTOVIDLAK,
Appellants

v.

ERNST & YOUNG, LLP;
NICHOLAS R. TOMS, a/k/a Nic Toms;
HUGO BIERMANN; GREGORY THOMAS;
EDWARDSTONE & COMPANY, INC;
WAYNE CLEVINGER; JOSEPH ROBINSON;
MIDMARK CAPITAL, LP; OTTO LEISTNER;
BUNTER B.V.I. LTD.; GEORGE POWCH;
STEPHEN M. DUFF; CLARK ESTATES, INC.;
RAYMOND BROEK; DONALD ROWLEY;
DOUGLAS L. DAVIS; BARBARA H. MARTORANO;
JACQUI GERRARD

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 01-cv-5747
(Honorable William H. Walls)


Argued January 31, 2007

Before:  SCIRICA, *Chief Judge*, FUENTES
and CHAGARES, *Circuit Judges*

(Filed  July 23, 2007)

STEVEN M. KAPLAN, ESQUIRE (ARGUED)
Kaplan & Levenson
630 Third Avenue
New York, New York 10017
        Attorney for Appellants

BRUCE M. CORMIER, ESQUIRE (ARGUED)
Ernst & Young
1l01 New York Avenue, N.W.
Washington, D.C. 20005
        Attorney for Appellee Ernst & Young

2

SCIRICA, *Chief Judge*.

The principal issue in this securities fraud action against auditors Ernst & Young, LLP is whether plaintiffs presented sufficient evidence of loss causation to survive a summary judgment motion. We will affirm the grant of summary judgment.

## I.

### A.

Plaintiffs Daniel McCabe, Russell McCabe, and David Motovidlak ("the ATS Plaintiffs") had been shareholders and officers of Applied Tactical Systems, Inc., a closely-held supply chain management company that was acquired by Vertex Interactive, Inc., a publicly-traded supply chain management company. The Merger Agreement was negotiated between October and December 2000, during which period Vertex's stock price fluctuated between $7.66 and $18.50 per share. The Merger Agreement provided the ATS Plaintiffs would exchange all their shares of ATS stock for three million unregistered shares of Vertex common stock, as well as stock options. Vertex promised to obtain an effective registration of the three million shares and the shares underlying the options "within fifteen (15) days of such time as financial results covering at

least thirty (30) days of combined operations of Vertex and ATS have been published by Vertex . . . but in any event no later than May 14, 2001." The unregistered shares were restricted from resale until either (1) their registration or (2) expiration of a one-year "lockup" period established by SEC regulations, 17 C.F.R. § 230.144(d)(1) (2000), whichever occurred first.

The Merger Agreement was signed on December 11, 2000. On that date Vertex's closing stock price was $8.69 per share. The merger was scheduled to close on December 29, 2000. In the Merger Agreement, Vertex made several representations, including that: (1) there were no pending or threatened legal claims against it that could reasonably be expected to have a material adverse effect on Vertex's financial performance or the merger; (2) all of its SEC filings contained no untrue statements and omitted no material fact necessary to make the filings not misleading; (3) the financial statements included in its SEC filings were prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and fairly presented Vertex's financial position; and (4) since the date of its SEC filings, Vertex's financial position had undergone no material change.

Between the merger's signing and closing dates, Vertex informed the ATS Plaintiffs that Ernst & Young was auditing Vertex's financial statements for the year ending September 30, 2000. The audited financial statements and Ernst & Young's unqualified opinion were scheduled to be published in Vertex's annual report (to be filed with its SEC Form 10-K), before the

December 29 closing date. Ernst & Young knew the ATS Plaintiffs would be reading and relying on the audit results before deciding whether to close the merger. On December 19, Ernst & Young issued an unqualified audit opinion on Vertex's financial statements for the year ending September 30, 2000. The audit opinion certified that Vertex's financial statements were prepared in accordance with GAAP, audited in accordance with Generally Accepted Auditing Standards ("GAAS"), and fairly presented Vertex's financial position in all material respects.

The merger closed as scheduled on December 29, 2000. On that date Vertex's stock price had dropped to $6.25 per share. Subsequently, Vertex failed to meet its earnings and revenue targets by a wide margin, and had difficulty integrating ATS and other acquired companies. Vertex failed to register the ATS Plaintiffs' shares by the promised deadline of May 14, 2001 (by which time Vertex's stock price had declined to $2.48 per share). The parties disputed the cause of Vertex's financial problems. Vertex contended that "as a result of the dramatic downturn in high tech stocks and the generally weak economy, [it] found itself in a 'no growth' market." *McCabe v. Ernst & Young*, No. 01-5747, 2006 WL 42371, at *2 (D.N.J. Jan. 6, 2006). The ATS Plaintiffs blamed a variety of factors, specifically "Vertex's (a) failure to pay its vendors resulting in the inability to fulfill customer orders; (b) failure to properly manage its expenses; (c) breach of its various agreements to make payments and to register the shares of stock used as

5

consideration in various acquisitions; and (d) failure to properly manage its business." *Id.*

Because of Vertex's registration default, the ATS Plaintiffs were unable to begin selling their Vertex shares until early 2002, after the one-year SEC lockup period had expired. By June 28, 2002, they had sold all their Vertex shares (which were never registered) in private transactions, realizing gross proceeds of approximately $940,000. Vertex's final stock price, immediately before its de-listing, was $0.07 per share.

The ATS Plaintiffs alleged it was only after the merger closed that they discovered Vertex had defaulted on similar registration obligations in the past; specifically, Vertex had failed timely to register with the SEC: (1) 1.3 million Vertex shares used as consideration for its acquisition of Communication Services International, Inc.; (2) 400,000 Vertex shares used as consideration for its acquisition of Positive Development, Inc.; and (3) 3 million shares in a private placement. The ATS Plaintiffs also alleged it was only after closing that they learned that former shareholders of Communication Services International and Positive Development had threatened to sue both Vertex and Ernst & Young over the registration defaults.[1] Additionally, the ATS

---

[1]Former shareholders of Communication Services International and Positive Development had threatened Vertex with litigation over its registration defaults at least as early as November 2000. Former shareholders of Communication

6

Plaintiffs allegedly only then discovered that the nearly five million shares involved in Vertex's prior registration defaults were first exposed to market sales only when they were eventually registered in February 2001 (five months after negotiation of the price Vertex would pay for ATS) rather than in September 2000 (before the negotiations). The ATS Plaintiffs alleged this meant Vertex was "exposed to over $25 million in related contingent liabilities" that they were unaware of when they agreed to the merger. ATS Br. 10.

---

Services International filed suit against Vertex in United States District Court for the District of New Jersey on September 7, 2001, alleging breach of contract, fraud, and negligent misrepresentation. Compl., *Henley et al. v. Vertex Interactive et al.*, No. 01-4275 (D.N.J. Sept. 7, 2001). Communication Services International's former president stated in a deposition that the plaintiffs reached a settlement with Vertex "[t]owards the end of January . . . 2002 . . . ." (J.A. 558.) Former shareholders of Positive Development filed suit against Vertex in California Superior Court for the County of Los Angeles on November 20, 2001, alleging fraud, promissory fraud, breach of fiduciary duty, and negligent misrepresentation. Am. Compl. ¶ 123, *McCabe*, No. 01-5747 (D.N.J. Mar. 21, 2002). Vertex disclosed the Positive Development lawsuit in a January 25, 2002, Form 10-K filing with the SEC. Positive Development's former president stated in a deposition that the plaintiffs reached a settlement agreement with Vertex at some point, but its terms were confidential.

Neither Vertex's financial statements nor Ernst & Young's audit opinion (nor any of Vertex's prior SEC filings) disclosed that Vertex had defaulted on prior registration obligations or had been threatened with litigation as a result. The ATS Plaintiffs alleged Ernst & Young had known of these prior registration defaults and threatened lawsuits, but consciously decided not to disclose them "in plain violation of GAAP and GAAS." *Id.* at 11. The ATS Plaintiffs also alleged that, had they known of the prior registration defaults and associated threats of litigation, they would not have closed the merger. In a deposition, the Ernst & Young partner in charge of the Vertex audit conceded that if he had been in the ATS Plaintiffs' position, he, too, would have wanted to have that information before deciding whether to close the merger.

**B.**

After unsuccessful arbitration with Vertex, the ATS Plaintiffs sued both Vertex and Ernst & Young in December 2001. After negotiating a $4 million settlement with Vertex in November 2002, the ATS Plaintiffs proceeded with the three causes of action against Ernst & Young in their Amended Complaint: violation of § 10(b) of the Securities Exchange Act of 1934; common law fraud; and negligent misrepresentation. All three claims were based on the same alleged omissions by Ernst & Young—that Vertex had previously failed to register stock and had been threatened with lawsuits as a result. The ATS Plaintiffs contended this information should have been disclosed in Vertex's 2000 financial statements, and that they

8

would not have closed the merger had they known it. Both parties presented expert testimony on whether the alleged omissions had actually caused the ATS Plaintiffs' economic loss.

Ernst & Young submitted deposition testimony and an expert report from University of Pittsburgh economics professor Kenneth Lehn that disclosure of Vertex's prior registration defaults had no material effect on the price of Vertex stock, and so the ATS Plaintiffs had incurred no damages as a result of the omissions. Lehn stated that the market did not become aware of any prior registration defaults by Vertex (or associated threats of litigation) until January 2002, when Vertex publicly disclosed that an action had been commenced against it by former shareholders of Positive Development. He opined that, even then, the price of Vertex stock did not change by a statistically significant amount, demonstrating investors did not consider the information material. "In other words," the District Court summarized Lehn's view, the ATS Plaintiffs "suffered zero damages as a result of the alleged fraud." *McCabe*, 2006 WL 42371, at *3. Lehn also stated the ATS Plaintiffs could have realized between $4.9 and $5.7 million had they been able to sell their Vertex shares by the May 14, 2001, registration deadline. The ATS Plaintiffs contended this was tantamount to an admission that they suffered an economic loss of at least $4.76 million (the estimated May 14, 2001, sale price minus the $940,000 the ATS Plaintiffs were eventually able to obtain from the sale of their Vertex shares) because of Ernst & Young's

9

omission. But the District Court concluded Lehn had done nothing more than calculate what *may* have occurred by a date certain, rather than attribute any responsibility to Ernst & Young.

The ATS Plaintiffs' expert, Fordham University finance professor John Finnerty, approached the question of loss causation in a different manner: using two common valuation methodologies, he estimated that ATS had an intrinsic value of between $34.49 million and $47.78 million at the time of the merger's closing. In his expert report, Finnerty noted the transaction with Vertex could be assigned an implied value of $26 million (because the ATS Plaintiffs were to receive three million shares of Vertex common stock, which was trading at $8.69 per share on the date the Merger Agreement was signed). But in his subsequent deposition he stated: "I was asked to value ATS, and that's what I valued. Nothing in my report implies anything about the value of the Vertex shares. There's an implied value which I cite. I valued ATS." Finnerty stated he had no opinion on the value of either the shares or stock options the ATS Plaintiffs received, but that "the McCabes sold the company too cheaply. I think it was worth more than the price they received." But he added: "I think that if I were to value all of those components [of the consideration the ATS Plaintiffs received] and add them up, I believe I would get a value within the [$34.49–$47.78 million] range I've estimated. I didn't try to do that, but I believe that to be the case."

Following discovery, Ernst & Young moved for summary

10

judgment on all three causes of action. The District Court granted the motion, finding the ATS Plaintiffs had failed to create a genuine issue of material fact as to loss causation. It stated the facts alleged by the ATS Plaintiffs "suggest transaction causation, not loss causation." *McCabe*, 2006 WL 42371, at *8. The ATS Plaintiffs timely appealed.

## II.

### A.

The District Court had federal question jurisdiction under 28 U.S.C. § 1331 over the ATS Plaintiffs' Securities Exchange Act § 10(b) claim and supplemental jurisdiction under 28 U.S.C. § 1367 over their related fraud and negligent misrepresentation claims. We have jurisdiction under 28 U.S.C. § 1291.

### B.

We exercise de novo review of the District Court's grant of summary judgment. *See, e.g.*, *Slagle v. County of Clarion*, 435 F.3d 262, 263 (3d Cir. 2006). Summary judgment is proper where the moving party has established "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To demonstrate that no issue is in dispute as to any material fact, the moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To

11

survive the motion, the non-moving party must show specific facts such that a reasonable jury could find in its favor. *See* Fed. R. Civ. P. 56(e). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). A court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.*

In interpreting state law in the absence of a controlling decision from a state's highest court, "it is the duty of the [federal court] to ascertain from all the available data what state law is and apply it." *West v. AT&T Co.*, 311 U.S. 223, 237 (1940).

## III.

Section 10(b) of the Securities Exchange Act forbids (1) the "use or employ[ment of] . . . any manipulative or deceptive device or contrivance," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b) (2006). SEC regulations, in turn, make it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-

12

5(b) (2006) ("Rule 10b-5").

The Supreme Court has identified the six required elements of a Securities Exchange Act § 10(b) private damages action:

> (1) *a material misrepresentation (or omission)*;
> (2) *scienter*, *i.e.*, a wrongful state of mind;
> (3) *a connection with the purchase or sale of a security*;
> (4) *reliance*, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation";
> (5) *economic loss*; and
> (6) "*loss causation*," *i.e.*, a causal connection between the material misrepresentation and the loss.

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (citations omitted). *See also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). The common law loss causation element is codified as a requirement in the Private Securities Litigation Reform Act ("PSLRA"): "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4) (2006). *See also Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 208 n.15 (3d Cir. 2006).

**A.**

13

We have stated that "[u]nder Rule 10b-5 causation is two-pronged." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001). A plaintiff must show both: (1) "transaction causation" (or "reliance"), i.e., that but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security; and (2) "loss causation," i.e., that the fraudulent misrepresentation or omission actually caused the economic loss suffered. *Id.* at 172–73. In addressing § 10(b) claims, and especially their loss causation element, we have distinguished between "typical" and "non-typical" claims. *See, e.g.*, *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("In considering loss causation, it is important to recognize . . . how this case differs from the usual securities action.").[2] But we have consistently required that both transaction causation and loss causation must be established in § 10(b) cases, and have

---

[2]We noted in *EP MedSystems*, 235 F.3d at 871, that § 10(b) claims are typically brought in securities actions in which a plaintiff claims a defendant made material public misrepresentations or omissions in order to affect the price of its publicly-traded stock, i.e., to perpetrate "fraud on the market." But *EP MedSystems* and *Berckeley* involved § 10(b) claims alleging misrepresentations or omissions that induced another party into entering a private transaction. Nevertheless, *Berckeley* reaffirms that, fundamentally, the same loss causation analysis occurs in both typical and non-typical § 10(b) cases. *See infra*, Part III.A.

14

never allowed the elements to merge.

"Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff." *Berckeley*, 455 F.3d at 222.[3] A § 10(b) plaintiff must show both that (1) the plaintiff entered the transaction at issue in reliance on the claimed misrepresentation or omission (transaction causation) and (2) the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss (loss causation).

**1.**

It is more difficult to categorize the required loss causation showing in non-typical § 10(b) actions such as this one than it is in typical § 10(b) actions. In a typical "fraud-on-

---

[3]The loss causation requirement limits the circumstances in which an investor can sue over a failed investment, so that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with that investment. "Otherwise, for example, a seller who fraudulently induced a purchase of securities in early October 1987 would have become an insurer against the precipitous price decline caused in large part by the market crash on October 19." 3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.11[3] (5th ed. 2005) [hereinafter Hazen, *Securities Regulation*].

15

the-market" § 10(b) action, the plaintiff shareholder alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission; to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184–85 (3d Cir. 2000). *See also EP MedSystems*, 235 F.3d at 884 (collecting typical § 10(b) cases).

But in a non-typical § 10(b) action, where the plaintiff does not simply allege that the price of a publicly-traded security has been affected, the factual predicates of loss causation fall into less of a rigid pattern. For example, the plaintiff corporation in *EP Medsystems* alleged the defendant corporation had violated § 10(b) by inducing plaintiff to buy shares in defendant through misrepresentations about "imminent" business opportunities that were actually non-existent. 235 F.3d at 869. We held the plaintiff's argument it had been "induced to make an investment of $1.4 million which turned out to be worthless" was a sufficient allegation of loss causation to survive a motion to dismiss. *Id.* at 884. And in *Newton*, a putative class of investors sued defendant broker for violating § 10(b) by executing trades at stock prices established by an industry-wide system rather than on the reasonably available terms most favorable to plaintiffs. 259 F.3d at 162. We stated

16

that the difference between (1) the price at which a trade had been executed and (2) the price at which it could reasonably have been executed could be a sufficient showing of loss causation. *Id.* at 181 n.24. The ATS Plaintiffs' § 10(b) claim is clearly a non-typical one. In return for selling their ATS shares in a private transaction, they received consideration that included unregistered shares of and options for Vertex stock. That the ATS Plaintiffs could not re-sell those shares for a year unless Vertex registered them further distinguished the ATS Plaintiffs from the typical purchaser of publicly-traded securities who claims to have been misled into making the purchase by fraud on the market.

In order to satisfy the loss causation requirement in both typical and non-typical § 10(b) actions, the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.

## 2.

The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss. *See Semerenko*, 223 F.3d at 185, 187 (stating "an investor must . . . establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation" and clarifying the loss causation requirement would not be met where "the misrepresentations were not a substantial factor"). In *EP MedSystems*, we characterized *Semerenko*'s as "a practical approach, in effect

17

applying general causation principles." 235 F.3d at 884. Adopting this "practical approach," we considered the following loss causation allegations in *EP MedSystems*: the defendant medical research and development company had told the corporate investor plaintiff that contracts between the company and four prominent corporations to market the company's new women's health products were "imminent," when in fact the company had never been on the verge of entering any such marketing contract; the company had provided the investor with sales projections (necessarily based on consummation of the aforementioned contracts) that showed the company would enjoy liquidity for two years; the statements and sales projections had induced the investor to purchase 280,000 shares of the company's preferred stock for $1.4 million, in the expectation of profiting from the "imminent" contracts; and the investor subsequently discovered that, because the "imminent" contracts were actually non-existent, the company would run out of operating funds within six months of the investment, which thus turned out to be worthless. We held the plaintiff's allegation of loss causation was sufficient to survive a motion to dismiss.[4]

---

[4]We emphasized that loss causation "becomes most critical at the proof stage," *EP MedSystems*, 235 F.3d at 884, and also stated: "Although . . . the allegation that [plaintiff] 'sustained substantial financial losses as a direct result of the aforementioned misrepresentations and omissions on the part of [defendant]' could have more specifically connected the

In *Berckeley*, 455 F.3d at 223, another non-typical § 10(b) case, we held the loss causation requirement had not been satisfied because plaintiff had failed to establish a "direct causal nexus between the misrepresentation and the plaintiff's economic loss."  Plaintiff Colkitt, the chairman and principal shareholder of a corporation, entered a private agreement to sell convertible debentures to defendant, an offshore financing entity: Colkitt would receive $2 million in exchange for forty

---

misrepresentation to the alleged loss, i.e., investment in a company with little prospects, when we draw all inferences in plaintiff's favor, we conclude that MedSystems has adequately alleged loss causation," *id.* at 885.  The procedural posture of *EP MedSystems* necessitated a different approach to the loss causation requirement than here on summary judgment, where discovery has taken place.  *See* 3 Hazen, *Securities Regulation* § 12.11[3] ("Loss causation issues can be highly factual, thus frequently precluding judgment on the pleadings."); *see also Dura*, 544 U.S. at 346–47 (holding the plaintiff had not adequately alleged loss causation and noting that, in the context of a motion to dismiss, a plaintiff is only required to give a "'short and plain statement' . . . describing the loss caused by the defendants' . . . misrepresentations"); Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 276 (Supp. 2007) ("At its core, *Dura* is largely a case about pleading.  The Court concluded its analysis by highlighting how little would have been necessary by the plaintiffs to have effectively pled this cause of action.").

19

convertible debentures; and in lieu of repayment, the offshore entity was entitled to convert up to 50% of its debentures into unregistered shares in the corporation, to be issued by Colkitt. The number of shares the offshore entity was entitled to obtain depended on the market price of the corporation's stock. In the agreement, the offshore entity warranted that all subsequent sales of its debentures or shares would be undertaken in accordance with federal securities law registration requirements.

Soon after the agreement closed, Colkitt accused the offshore entity of short-selling in order to deflate the market price of the corporation's stock, so that it could obtain more shares from him upon conversion of its debentures. In retaliation, when the time came for Colkitt to convert the unregistered shares and thereby repay his debt, he converted only a small percentage of the shares the offshore entity requested, breaching the agreement. Both parties filed suit. One of Colkitt's arguments on summary judgment was that he was justified in not complying with the agreement because the offshore entity made material misrepresentations in the agreement to induce Colkitt into entering it, in violation of § 10(b). Specifically, Colkitt contended: securities laws required the offshore entity to file a registration statement before it could sell the shares it had purchased from him; the offshore entity warranted it would comply with securities laws in subsequent sales of the shares; the offshore entity later sold the still-unregistered shares; and therefore, because the offshore entity had intended to do this all along, its representations in the

20

agreement that it would comply with applicable securities laws were misrepresentations.

In order to establish the loss causation element of his § 10(b) claim, Colkitt contended his shares in the corporation lost value as a direct and proximate result of the offshore entity's misrepresentations. We rejected this argument, noting Colkitt had (1) himself alleged that the corporation's stock price had decreased because of short-selling by the offshore entity, and (2) presented no evidence connecting the stock price to the misrepresentations.

> Colkitt's complaint asserts that his NMFS share holdings lost value because of Berckeley's alleged misrepresentation. We disagree. Based on the record before us, there is absolutely no connection between the price decrease in NMFS shares and Berckeley's unrelated alleged misrepresentation as to its intent to comply with offshore registration requirements. . . . We hold that Colkitt failed to set forth sufficient facts that the precipitous loss in value in his NMFS share holdings was proximately caused by Berckeley's alleged misrepresentation. There is no evidence in the record that the decline in the price per share of NMFS stock was connected in any manner to alleged misrepresentations regarding Berckeley's intent to evade Section 5 registration requirements . . . .

21

*Berckeley*, 455 F.3d at 223–24.[5]

**3.**

The Court of Appeals for the Fifth Circuit has offered a concise statement of what is required to show that a misrepresentation or omission proximately caused an economic loss:

> The plaintiff must prove . . . that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The [loss] causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements

---

[5]Colkitt made two additional § 10(b) claims, contending that, as a direct and proximate result of the offshore entity's misrepresentations, he suffered damages in the form of (1) the sale of shares in the corporation to the offshore entity at a 17% discount from their market value and (2) the possible requirement to pay interest and penalties on the outstanding debentures under the agreement. We remanded these claims because record evidence on loss causation was "unclear" as to them. *Berckeley*, 455 F.3d at 223 n.25. But we noted the remand was "only a Pyrrhic victory for Colkitt, who will not be able to recover his largest category of damages from Berckeley, which is the drop in stock prices . . . ." *Id.* at 224 n.27.

or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.

*Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983). *See also Berckeley*, 455 F.3d at 222 ("[T]he loss causation element requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries.'") (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)). This approach has been advocated by some scholars, as well:

> [I]f false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way relate[d] to the representations will not afford any basis for recovery. It was only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered.

W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 110 (5th ed. 1984). *See also* Dane A. Holbrook, *Measuring and Limiting Recovery Under Rule 10b-5: Optimizing Loss Causation and Damages in Securities Fraud Litigation*, 39 Tex. J. Bus. L. 215, 260–62 (2003) ("The materialization of risk

approach requires plaintiffs to prove that the materialization of an undisclosed risk caused the alleged loss. . . . [C]ourts utilizing this approach will not compensate a plaintiff who assumes the risk of an intervening factor. . . . [This] approach most appropriately balances the interests of plaintiffs and defendants.").

We believe this approach is consistent with our loss causation jurisprudence in *Berckeley*, *Newton*, and *EP Medsystems*. Therefore, to make the requisite loss causation showing, the ATS Plaintiffs must show that Vertex's prior registration defaults and consequent litigation risks (the very facts Ernst & Young allegedly omitted) were a substantial factor in causing the ATS Plaintiffs' economic loss.[6]

---

[6]This standard is consistent with the district court cases cited in the ATS Plaintiffs' brief. In *Rosen v. Communication Services Group, Inc.*, 155 F. Supp. 2d 310 (E.D. Pa. 2001), plaintiffs claimed they were induced to purchase convertible debentures from defendant in reliance on defendant's repeated promises that its company would go public (a "liquidity event" that would have converted the debentures into common stock); plaintiffs attributed their damages to defendant's failure to go public (the very fact misrepresented), and the court, relying on *EP MedSystems*, found this a sufficient allegation of loss causation to overcome a motion to dismiss, *id.* at 321. *See also In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 629–30 (D. Del. 2003) (denying summary judgment because

24

**B.**

Before addressing the adequacy of the ATS Plaintiffs' loss causation showing here, we address two points of their argument that warrant further discussion.

**1.**

First, the ATS Plaintiffs rely on *EP MedSystems* to contend that "plaintiffs must prove . . . that [Ernst & Young's] misstatements and omissions . . . were causally linked to . . . the loss of ownership of ATS." ATS Br. 22. Their argument is that they can satisfy the loss causation requirement by showing a causal nexus between (1) Ernst & Young's alleged omissions and (2) the ATS Plaintiffs' decision to close the merger (which is when they gave up their ATS shares). But by focusing only on whether the ATS Plaintiffs were induced into the transaction by Ernst & Young's alleged omissions, this argument impermissibly conflates loss causation with transaction causation, rendering the loss causation requirement meaningless. The ATS Plaintiffs essentially admit this is the approach they advocate: "Courts have acknowledged that where the omission of collateral facts fraudulently induces a transaction that would

---

evidence created a genuine issue as to whether defendant's mischaracterization of a transaction as being a merger of equals rather than an acquisition prevented plaintiff from obtaining control premium it would have received had the transaction been properly characterized).

25

not have otherwise taken place, as in this case, loss causation and transaction causation 'effectively merge.'" *Id.* at 20 n.7.

The Supreme Court recently reiterated that a § 10(b) plaintiff must show both loss causation and transaction causation. *Dura*, 544 U.S. at 341–42. And even in non-typical § 10(b) cases, where we have called for a practical approach to loss causation, this Court has consistently distinguished loss causation from transaction causation: we have required both loss causation and transaction causation to be established, and have analyzed them separately. *See, e.g.*, *Newton*, 259 F.3d at 174–77 (analyzing transaction causation separately from loss causation); *EP MedSystems*, 235 F.3d at 882–83 (same).[7] This is because

---

[7]The Courts of Appeals for the Second and Ninth Circuits have held that, in the limited circumstance of a defendant broker fraudulently inducing a plaintiff investor to purchase securities in order to "churn" plaintiff's portfolio and generate commissions, plaintiff need not show loss causation to make a § 10(b) claim, as long as the transaction causation requirement is met: "The plaintiff . . . should not have to prove loss causation where the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security." *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir. 1984). In *Hatrock*, a stock broker repeatedly made misrepresentations about upcoming corporate takeovers, encouraging clients to engage in repeated sale and re-acquisition of certain stocks (whose value steadily declined)

the two prongs of causation in § 10(b) cases are rooted in traditional common law principles, and serve different purposes:

purely so that the broker could generate commissions. The court stated: "the customer may hold the broker liable for churning without proving loss causation." *Id. See also Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970) ("The issue is not whether Smith, Barney was actually manipulating the price on Chasins or whether he paid a fair price, but rather the possible effect of disclosure of Smith, Barney's market-making role on Chasins' decision to purchase at all on Smith, Barney's recommendation. It is the latter inducement to purchase by Smith, Barney without disclosure of its interest that is the basis of this violation . . . ."). The Ninth Circuit has emphasized the narrowness of this exception. *See Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1486 n.7 (9th Cir. 1991) ("We decline to [apply the *Hatrock* exception here] because the exception appears capable of swallowing the rule. We therefore view the *Hatrock* exception as limited to the facts of that case, which involved churning of trading accounts by brokers."); *see also Bastian v. Petren Res. Corp.*, 681 F. Supp. 530, 535 (N.D. Ill. 1988) (citing *Hatrock* and *Chasins* and stating that "the courts which have rejected a 'loss causation' requirement have done so in cases involving a particular and special form of § 10(b) violation—stock broker 'churning' of client accounts"). We cited *Hatrock* in dicta in *Berckeley*, but this Court has never found such an exception applicable.

27

It must be remembered that, as in other areas of the law, causation embodies two distinct concepts: (1) cause in fact and (2) legal cause. Legal cause is frequently dealt with in terms of proximate cause. Cause-in-fact questions are frequently stated in terms of the sine qua non rule: but for the act or acts complained of, the injury would not have occurred. Legal cause represents the law's doctrinal basis for limiting liability even though cause in fact may be proven. . . . Causation in securities law involves the same analysis of cause in fact and legal cause that was developed under the common law.

3 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.11[1] (5th ed. 2005). *See also* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 276 (Supp. 2007) ("The Supreme Court decision in *Dura* was notable for its close reliance on common law concepts . . . .").

We have never suggested that the loss causation inquiry may "effectively merge" with the transaction causation inquiry. In *Berckeley* (a non-typical § 10(b) decision) we stated that "[l]oss causation is a more exacting standard" than transaction causation. 455 F.3d at 222. That is because "'[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement.'" *Id.* (quoting *Suez Equity Investors, L.P. v. Toronto-*

*Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001)) (alteration in *Berckeley*). "[T]he loss causation element requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries.'" *Id.* (quoting *Caremark*, 113 F.3d at 648).

The ATS Plaintiffs rely on *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980), in which investors sued a brokerage house for violating § 10(b) after they had purchased and retained securities (whose value subsequently declined) on the advice of a trainee who misrepresented himself as a licensed broker and portfolio management specialist. The value of the securities did not decline because of the trainee's misrepresentation, but the Court of Appeals for the Second Circuit nevertheless held that the plaintiffs had satisfied the loss causation requirement. The majority wrote that, though the case was "not one in which a material misrepresentation of an element of value intrinsic to the worth of the security is shown to be false," the misrepresentation nevertheless proximately caused plaintiffs' economic loss, because it was foreseeable that the trainee's false credentials would have induced them to purchase and retain the stocks he recommended despite "misgivings prompted by the market . . . ." *Id.* at 708. The dissent, however, wrote that the loss causation requirement had not been met:

> In straining to reach a sympathetic result, the majority overlooks a fundamental principle of causation which has long prevailed under the

29

common law of fraud and which has been applied to comparable claims brought under the federal securities acts. This is, quite simply, that the injury averred must proceed directly from the wrong alleged and must not be attributable to some supervening cause. This elementary rule precludes recovery in the case at bar since Kohn's misrepresentations as to his qualifications as a broker in no way caused the decline in the market value of the stocks he promoted.

*Id.* at 716–17 (Meskill, J., dissenting). District courts within this Circuit have identified the majority opinion in *Marbury Management* as an outlier inconsistent with our precedents, and have instead followed Judge Meskill's dissent.[8]

---

[8] *See Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F. Supp. 557, 562 (W.D. Pa. 1996) (citing *Marbury Management* for the minority view that no showing of loss causation is required where a showing of transaction causation has been made and citing Judge Meskill's dissent as providing the "rationale for requiring loss causation"); *Hartman v. Blinder*, 687 F. Supp. 938, 943 n.5 (D.N.J. 1987) (stating *Marbury Management* "found loss causation in a case where the facts would seem to support only a finding of transaction causation" and that "[t]he 'vehement dissent' of Judge Meskill has been lionized"); *In re Catanella and E.F. Hutton & Co. Sec. Litig.*, 583 F. Supp. 1388, 1417 (E.D. Pa. 1984) ("I find the view

To the extent *Marbury Management* conflates the loss causation and transaction causation requirements in § 10(b) cases, it is contrary to our jurisprudence and, more importantly, to the Supreme Court's recent decision in *Dura*. *See Dura*, 544 U.S. at 341–42 (stating a § 10(b) claim's "basic elements" include both transaction causation and loss causation). We also note the Court of Appeals for the Second Circuit has apparently disavowed this aspect of *Marbury Management*. In *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005), the court began its discussion of loss causation by stating: "[i]t is long settled that a securities-fraud plaintiff must prove both transaction and loss causation." In order to establish loss causation, it said, "'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173 (quoting *Suez Equity*, 205 F.3d at 95) (alteration in *Lentell*). The court stated that its cases "require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk," *id.*, and cited *Marbury Management* for the *contrary* proposition that an "allegation that fraud induced [an] investor to make an

_____

articulated by Judge Meskill . . . to be logical and consistent with the definition of loss causation. A contrary view would render meaningless the distinction between transaction and loss causation, thereby writing the proximate cause requirement out of a section 10(b) cause of action.").

31

investment and to persevere with that investment [was] sufficient to establish loss causation," *id.* at 174. As two commentators noted, the Second Circuit thus "appeared implicitly to overrule the long-controversial opinion in *Marbury Management*[,] dismissing it with a 'but see' citation at the end of its analysis, and pointedly noting that '[w]e follow the holdings of *Emergent Capital*, *Castellano*, and *Suez Equity*'—conspicuously omitting *Marbury*." Martin Flumenbaum & Brad S. Karp, *Loss Causation in the Research Analyst Cases (and Beyond)*, N.Y.L.J., Jan. 26, 2005, at 3, 7 (quoting *Lentell*, 396 F.3d at 174) (second alteration in Flumenbaum & Karp). Even before *Lentell*, the Second Circuit had maintained that transaction causation and loss causation were to be considered separately. *See AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 216 (2d Cir. 2000) (concluding, after discussing *Marbury Management* and case law in the Circuit subsequent to it, that "[l]oss causation is a separate element from transaction causation, and, in situations such as the instant one, loss causation cannot be collapsed with transaction causation"); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, Nos. 05-5132 & 05-2593, 2007 WL 1989336, at *13 (2d Cir. July 11, 2007) (stating "[a] plaintiff is required to prove both transaction causation . . . and loss causation" and concluding the allegation that a seller misrepresented that a fund was an accredited investor, in order to induce a buyer to enter a transaction, "might support transaction causation; it fails, however, to show how the fact that the Shaar Fund was not an accredited investor caused any loss"). Under *Dura*, as well as

32

under our own jurisprudence, a § 10(b) plaintiff is required to establish both loss causation and transaction causation.

**2.**

Second, the ATS Plaintiffs contend "they were damaged at the moment the ATS Merger closed," ATS Br. 20, when they sold a company worth up to almost $48 million in exchange for consideration whose "quality and value [were] far inferior to that which was represented to them," *id.* at 19. They cite cases from the Court of Appeals for the Second Circuit in support of the proposition that "in cases like this, plaintiffs do not have to demonstrate a post-acquisition decline in market price in order to establish loss causation." *Id.* at 15 n.5.[9] Their argument is that, when the plaintiff has been fraudulently induced to make an investment that is actually worth less than the plaintiff has been misled into believing, the loss causation requirement is satisfied at the moment the transaction occurs.

As an initial matter, it is not clear that this would be a viable argument for the ATS Plaintiffs, even if it were a valid one. As discussed, they presented no evidence of the value of the consideration they received at the time the merger closed: Dr. Finnerty estimated the value of what the ATS Plaintiffs gave

---

[9]The ATS Plaintiffs' brief cites *Lentell*; *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001); *Suez Equity*; and *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974).

33

up, but expressed no opinion on the value of the Vertex shares and stock options they got back in return. Thus, there was insufficient evidence to show an economic loss for the ATS Plaintiffs at the moment the transaction occurred.[10]

More importantly, this argument is inconsistent with controlling precedent. In *Dura*, the Supreme Court explicitly rejected the argument that a § 10(b) plaintiff could satisfy the loss causation requirement simply by showing that "'the price *on the date of purchase* was inflated because of the misrepresentation.'" 544 U.S. at 342. Reversing the Court of Appeals for the Ninth Circuit, the Court explained:

> [T]he logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its

---

[10]In fact, Dr. Finnerty arguably suggested the ATS Plaintiffs had suffered no economic loss at all at the moment the transaction occurred. He stated in his deposition that, although he had not tried to calculate the value of all the components of consideration the ATS Plaintiffs received, he believed that, had he done so, the figure would have been within the $34.49–$47.78 million range he estimated ATS to be worth.

34

way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . .

Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss.

*Id.* at 342–43. As the Supreme Court noted, this Court, too, has "rejected the Ninth Circuit's 'inflated purchase price' approach to proving causation and loss." *Id.* at 344 (citing *Semerenko*, 223 F.3d at 185). The District Court rightly noted that *Dura* dealt with a typical fraud-on-the-market § 10(b) claim and is thus not directly controlling here, because the ATS Plaintiffs could not simply turn around and re-sell the unregistered Vertex shares they had received. *McCabe*, 2006 WL 42371, at *7.[11]

_____

[11]*See also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 944 n.1 (9th Cir. 2005) ("Although the Supreme Court's decision in [*Dura*] makes clear that in

35

Nevertheless, we believe the logic of *Dura* is persuasive.

The ATS Plaintiffs also cite a 2001 non-typical § 10(b) case from the Court of Appeals for the Second Circuit. In *Suez Equity*, 250 F.3d at 87, plaintiffs purchased $3 million in securities in a financing entity on the recommendation of defendant bank, which was already invested in the financing entity. Plaintiffs had asked the bank for a background report on the financing entity's controlling shareholder, Mallick, but the bank's report consciously omitted several negative events in Mallick's business career and financial history; instead, the bank claimed its investigation of Mallick had yielded a positive picture of his management skills. Within seven weeks of plaintiffs' investment, the financing entity suffered a cash flow crisis from which it never recovered, rendering their investment worthless. In their complaint, plaintiffs alleged the financing entity's collapse (and their consequent loss of the value of their

_____

fraud-on-the-market cases involving publicly traded stocks, plaintiffs cannot plead loss causation simply by asserting that they purchased the security at issue at an artificially inflated price, the Court refused to consider 'other proximate cause or loss-related questions.' Here, at issue is a private sale of privately traded stock and Livid not only asserted that it purchased the security at issue at an artificially inflated price, but pled that the Defendants' misrepresentation was causally related to the loss it sustained. Under these circumstances, *Dura* is not controlling.") (quoting *Dura*, 544 U.S. at 346).

36

investment) were attributable to Mallick's lack of management skills, the very facts omitted from the background report that induced plaintiffs to make their investment. The Second Circuit held that this allegation of loss causation was sufficient to survive a motion to dismiss:

> The complaint thus alleges that plaintiffs suffered a loss at the time of purchase since the value of the securities was less than that represented by defendants. Plaintiffs have also adequately alleged a second, related loss—that Mallick'sconcealed lack of managerial ability induced SAM Group's failure.

*Id.* at 98.

The ATS Plaintiffs cite *Suez Equity* to support the proposition that "in cases like this, plaintiffs do not have to demonstrate a post-acquisition decline in market price in order to establish loss causation." ATS Br. 15 n.5. But the Court of Appeals for the Second Circuit has clarified *Suez Equity*, undercutting the ATS Plaintiffs' argument:

> Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement. . . .
>
> In its misplaced reliance on *Suez Equity*, appellant overlooks a crucial aspect of that decision. . . .
>
> . . . Plaintiffs [in *Suez Equity*] claimed that

37

the concealed events reflected the executive's inability to manage debt and maintain adequate liquidity. Plaintiffs also alleged that their investment ultimately became worthless because of the company's liquidity crisis and expressly attributed that crisis to the executive's inability to manage the company's finances.

Thus, the *Suez Equity* plaintiffs did not merely allege a disparity between the price they had paid for the company's securities and the securities' "true" value at the time of the purchase. Rather, they specifically asserted a causal connection between the concealed information—*i.e.*, the executive's history—and the ultimate failure of the venture.

. . . We did not mean to suggest in Suez Equity that a purchase-time loss allegation alone could satisfy the loss causation pleading requirement. To the contrary, we emphasized that the plaintiffs had "also adequately alleged a second, related, loss—that [Mallick's] concealed lack of managerial ability induced [the company's] failure."

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003) (quoting *Suez Equity*, 250 F.3d

at 98) (last alteration in *Emergent Capital*).[12]

In *EP MedSystems*, we used language similar to that of *Suez Equity* in describing plaintiffs' investment as "worthless," but we characterized the loss as occurring subsequent to the transaction rather than contemporaneously with it. *Compare*

---

[12]In clarifying *Suez Equity*, *Emergent Capital* apparently also clarified two earlier Second Circuit case cited by the ATS Plaintiffs for the proposition that "plaintiffs do not have to demonstrate a post-acquisition decline in market price in order to establish loss causation." ATS Br. 15 n.5. *See Castellano*, 257 F.3d at 187 ("The rule affirmed in *Suez Equity* . . . is that 'plaintiffs may allege transaction and loss causation by averring both that they would not have entered the transaction but for the misrepresentations *and* that the defendants' misrepresentations induced a disparity between the transaction price and the true investment quality of the securities at the time of the transaction.'"); *Schlick*, 507 F.2d at 380 ("[Loss causation] is demonstrated rather easily by proof of some form of economic damage, here the unfair exchange ratio, which arguably would have been fairer had the basis for valuation been disclosed."). The fourth case cited by the ATS Plaintiffs, *Lentell*, simply does not support their argument. *See* 396 F.3d at 174 (citing *Emergent Capital* and stating that "[i]t is not enough to allege that a defendant's misrepresentations and omissions induced a 'purchase-time value disparity' between the price paid for a security and its 'true investment quality.'").

39

*Suez Equity*, 250 F.3d at 94 ("As a result, plaintiffs' SAM Group securities were at the time of acquisition—and are today—worthless.") *with EP MedSystems*, 235 F.3d at 884 ("In this case, MedSystems claims that as a result of fraudulent misrepresentations made in personal communications by EchoCath executives, it was induced to make an investment of $1.4 million which *turned out to be* worthless.") (emphasis added). Moreover, our discussion in *EP MedSystems* shows that the very facts which defendant misrepresented were allegedly a substantial factor in causing the subsequent loss of plaintiff's investment. First, we described the misrepresented future business opportunities: "DeBernardis represented that EchoCath had engaged in lengthy negotiations to license its products and was on the verge of signing contracts with a number of prominent medical companies . . . to develop and market EchoCath's women's health products." *EP MedSystems*, 235 F.3d at 868. Then we connected the subsequent economic loss to the failure of those future business opportunities to materialize:

> In the fifteen months after MedSystems made its investment, EchoCath failed to enter into a single contract or to receive any income in connection with the marketing and development of the women's health products. It also did not receive the expected payments from license fees. In September 1997, EchoCath advised MedSystems that EchoCath would run out of operating funds in

40

> 90 days if new investment in the company was not
> forthcoming.

*Id.* at 869. This is consistent with the Court of Appeals for the Second Circuit's clarification of *Suez Equity*. *See Emergent Capital*, 343 F.3d at 198 ("[T]he *Suez Equity* plaintiffs did not merely allege a disparity between the price they had paid for the company's securities and the securities' 'true' value at the time of the purchase. Rather, they specifically asserted a causal connection between the concealed information . . . and the ultimate failure of the venture.").

The ATS Plaintiffs presented no evidence that the value of the consideration they received, at the time the merger closed, was actually lower than they had been misled into believing. Even if they had presented such evidence, it alone would have been insufficient to satisfy the loss causation requirement. It is not enough for § 10(b) plaintiffs to show that a misstatement or omission induced them to buy or sell securities at a price less favorable to them than they had been misled into believing. Rather, they must show that the misstated or omitted facts were a substantial factor in causing an economic loss actually incurred by the plaintiffs.

## C.

In order to survive summary judgment, then, the ATS Plaintiffs had to create a genuine issue as to whether Vertex's registration defaults and the threats of litigation associated with them (the very facts omitted by Ernst & Young) were a

41

substantial factor in causing the ATS Plaintiffs' economic loss. That economic loss was embodied in Vertex's failure to meet its earnings and revenues targets following the merger, which resulted in a swift decline in the price of Vertex stock from $6.25 when the merger closed (on December 29, 2000) to $0.95 when the ATS Plaintiffs were finally able to begin selling off their shares (on December 31, 2001). The ATS Plaintiffs were able to realize only $940,000 on the eventual sale of three million unregistered shares of Vertex stock.

To restate the previous discussion, as well as rely on "general causation principles," *EP MedSystems*, 235 F.3d at 884, whether Ernst & Young's omission was a substantial factor in causing the ATS Plaintiffs' economic loss includes considerations of materiality, directness, foreseeability, and intervening causes. *See Berckeley*, 455 F.3d at 222 ("[T]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome . . . . [It] requires the plaintiff to prove that it was the very facts about which the defendant lied which caused its injuries."); *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) ("[A]n intervening act of a third party, which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about.") (citing Restatement (Second) of Torts §§

42

440–41 (1965)).[13]

We agree with the District Court that the factual record is devoid of sufficient evidence to create a genuine issue as to loss causation. The ATS Plaintiffs asserted in their counter-statement of material facts that "[a]mong the reasons for Vertex's failure to meet earnings and revenue targets was Vertex's . . . breach of its various agreements to make payments and to register the shares of stock used as consideration for various acquisitions." *McCabe*, 2006 WL 42371, at \*9. This might have been a sufficient allegation of loss causation to survive a motion to dismiss, as in *EP MedSystems*. *See supra*

---

[13]It is particularly important for the ATS Plaintiffs to show that the very facts omitted by Ernst & Young were a substantial factor in causing the decline in Vertex's financial fortunes, because both parties placed Vertex's performance in the context of a "general downturn in the economy," particularly for high-tech stocks. (J.A. 318.) *See* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 1283–84 (5th ed. 2004) ("[W]hen the market declines after the published rectification of a false earning statement that was used in the sale of an electronics stock, the misrepresentation is not the 'legal cause' of the buyer's loss, or at any rate not the *sole* legal cause, to the extent that a subsequent event that had no connection with or the relation to the misrepresentation caused a market drop—for example . . . *a softening of the market for all electronic stocks . . . .*") (second emphasis added).

note 4. But "[t]o survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex* 477 U.S. at 325).

Whereas Vertex's expert witness, Dr. Lehn, attempted to show that the price of Vertex's stock had not been affected by the disclosure of Vertex's registration defaults, the report of Dr. Finnerty, the ATS Plaintiffs' expert witness, focused solely on the value of ATS at the time of the merger. His rebuttal report challenged Dr. Lehn's damages-calculation methodology, but still focused on ATS's value, contending it was the best measure of the ATS Plaintiffs' damages. In Dr. Finnerty's deposition, he stated that he was never asked to value Vertex stock, and that he had no opinion on "whether the alleged misrepresentations of Ernst & Young proximately caused the decline of values in the Vertex shares after the merger."

The ATS Plaintiffs also specify in their brief that, "[a]s a result of the Registration Defaults, Vertex was experiencing substantial problems integrating its former merger partners . . . into the company's operations." ATS Br. 23. In support, they point to the depositions of the former presidents of Communication Services International and Positive Development, respectively Roger Henley and Walter Reichman. Henley and Reichman each received unregistered shares of Vertex stock that Vertex failed to register in a timely manner. Both stated that, because the price of Vertex stock was dropping

44

steadily, they wanted to sell off their shares, and were unable to do so as soon as they would have liked because of Vertex's registration defaults. The registration defaults thus prevented Henley and Reichman from selling at as high a price as they would have been able to obtain had Vertex complied with its obligations, creating an economic loss. But neither attributed Vertex's falling stock price or declining financial performance to the registration defaults. Evidence of that connection is what was required from the ATS Plaintiffs to create a genuine issue as to loss causation.

Henley did say that, at the time Communication Services International agreed to a settlement with Vertex over Vertex's registration default, "Vertex was having a lot of difficulties[,] they had cash problems and . . . there wasn't going to be a lot of dollars for taking care of settlements or judgments. So from our perspective we were competing with [the ATS Plaintiffs] for a limited dollar pool . . . ." He also said that Vertex was having "a lot of operational issues" at the time, issues "about things getting paid, vendor problems, customer problems." These two statements suggest that settlement payouts were putting a strain on Vertex's already-struggling finances, thus potentially contributing to the ATS Plaintiffs' economic loss. But, even taken together, they are insufficient to create a genuine issue as to loss causation.

Finally, the ATS Plaintiffs contend Ernst & Young's own expert, Dr. Lehn, gave evidence of loss causation. In his report, Dr. Lehn theorized that, had the ATS Plaintiffs been able to

45

begin selling off their Vertex stock on May 14, 2001 (by which date Vertex had promised to register the shares), they could have realized between $4.9 and $5.7 million. The ATS Plaintiffs characterize this as "an admission that Vertex's failure to register plaintiffs' shares caused plaintiffs to lose at least $4.76 million (*i.e.*, the $5.7 million that would have been realized had the shares been timely registered, less the $940,000 actually received)." ATS Br. 25. But we agree with the District Court that this alone is insufficient evidence of loss causation: the $4.76 million figure may be a measure of the ATS Plaintiffs' economic loss, and but for Ernst & Young's omissions the ATS Plaintiffs might not have been "locked into" that economic loss; but Dr. Lehn's report does not show that the omission proximately caused the economic loss. That is, it was not evidence that the falling price of Vertex stock was attributable to registration defaults and associated threats of litigation (the very facts omitted by Ernst & Young).

Because the ATS Plaintiffs cannot point to sufficient record evidence to show that the very facts misrepresented or omitted by Ernst & Young were a substantial factor in causing the ATS Plaintiffs' economic loss, we agree with the District Court that the ATS Plaintiffs failed to create a genuine issue as to loss causation.

## IV.

The District Court held that "[b]ecause [the ATS] Plaintiffs have failed to create a genuine issue as to loss

46

causation, it follows that [the ATS] Plaintiffs' common law fraud and negligent misrepresentation claims must fail as a matter of law." *McCabe*, 2006 WL 42371, at *14. We will affirm this holding, because the ATS Plaintiffs' failure to create a genuine issue as to loss causation also constitutes a fatal failure to create a genuine issue as to the proximate causation required for their claims under New Jersey law. *See, e.g.*, *Berckeley*, 455 F.3d at 224 n.28 ("[T]o the extent we have determined that Colkitt has stated a claim under Section 10(b), we will also reinstate Colkitt's claim that Berckeley's conduct [constituted] common law fraud under New York law.").

As the District Court noted, there is no New Jersey decision that addresses the precise issue raised here. *McCabe*, 2006 WL 42731, at *12. But proximate causation is a required element of both common law fraud and negligent misrepresentation under New Jersey law. *See Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1196 (N.J. 2000) (negligent misrepresentation); *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366–67 (N.J. 1997) (fraud). Under New Jersey tort law, "[t]he test of proximate cause is satisfied where . . . conduct is a substantial contributing factor in causing [a] loss." *2175 Lemoine Ave. Corp. v. Finco, Inc.*, 640 A.2d 346, 351–52 (N.J. Super. Ct. 1994) (citing *State v. Jersey Cent. Power & Light Co.*, 351 A.2d 337, 341–42 (N.J. 1976); *Ettin v. Ava Truck Leasing, Inc.*, 251 A.2d 278, 289 (N.J. 1969)).

Like other courts of appeals, we "apply[] general causation principles" to § 10(b) claims. *EP MedSystems*, 235

47

F.3d at 884. *See also Berckeley*, 455 F.3d at 222 (stating loss causation is "[s]imilar to the concept of proximate cause in the tort context," and citing *Suez Equity*, 250 F.3d at 96, and *Caremark*, 113 F.3d at 648 ). This approach was recently endorsed by the Supreme Court:

> Judicially implied private securities fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions. The common law of deceit subjects a person who "fraudulently" makes a "misrepresentation" to liability "for pecuniary loss caused" to one who justifiably relies upon that misrepresentation. And the common law has long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss.
>
>           . . . .
>           . . . [Section 10(b)] expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.' The statute makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.

48

*Dura*, 544 U.S. at 343–44, 345–46 (citations omitted). The §
10(b) loss causation standard we have reiterated here is similar
to the "substantial contributing factor" test of proximate
causation under New Jersey law. *2175 Lemoine Ave.*, 640 A.2d
at 351–52. Accordingly, for the same reasons that the ATS
Plaintiffs failed to create a genuine issue as to loss causation (as
required for their § 10(b) claim), they also failed to create a
genuine issue as to proximate causation (as required for their
common law fraud and negligent misrepresentation claims).

## V.

We will affirm the grant of summary judgment.