

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-27-2005

# Overall v. Univ PA

Precedential or Non-Precedential: Precedential

Docket No. 04-1090

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Overall v. Univ PA" (2005). *2005 Decisions.* Paper 908.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/908

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-1090

KAREN OVERALL and ARTHUR DUNHAM,

Appellants

v.

UNIVERSITY OF PENNSYLVANIA;
GAIL SMITH

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(Dist. Ct. No. 02-CV-01628)
District Court Judge: Hon. Cynthia M. Rufe

Argued: March 31, 2005

Before: ALITO, SMITH, and FISHER, Circuit Judges

(Opinion Filed: June 27, 2005)

*Counsel for Appellant*
Stanley B. Cheiken (argued)
1626 Pine St.
Philadelphia, PA 19103

*Counsel for Appellees*
Michael L. Banks
Michael E. Dash, Jr. (argued)
Morgan, Lewis & Bockius, LLP
1701 Market St.
Philadelphia, PA 19103

---

OPINION OF THE COURT

---

ALITO, Circuit Judge

Karen Overall is a faculty member at the University of Pennsylvania ("Penn") Veterinary School. She and her husband brought this action against Penn, alleging defamation and fraudulent misrepresentation, among other things. The District Court granted summary judgment for Penn on all counts, and Overall appealed. Because the District Court incorrectly held that statements made in a private internal University grievance proceeding were "quasi-judicial" and therefore entitled to an absolute privilege against defamation under Pennsylvania law, we reverse and remand with respect to Dr. Overall's defamation claim. We affirm on all other counts.

I.

This case stems from the Veterinary School's failure to hire Dr. Overall for a newly created faculty position. Dr. Overall worked for Penn in various capacities since 1987. In early 1999, she was serving a single-year appointment as a "Lecturer" in the School's Department of Clinical Studies-Philadelphia ("DCS"), where her responsibilities included running a behavioral medicine clinic, teaching, and conducting research. Dr. Gail Smith, a male professor who had taught at Penn since the early 1980s, became chair of DCS in March 1999. Until Dr. Smith became Chair, Drs. Smith and Overall rarely interacted.

Once Dr. Smith became chair of DCS, he and Dr. Overall

2

developed an amicable relationship. See Joint Appendix ("App.") at 368 (Overall admits during a deposition that "[w]e were friends"); id. at 428 (Overall writes Dr. Smith in June 1999: "We are making incredible progress, but that's all your doing, none of mine."); id. at 433 (Overall writes Dr. Smith in July 1999: "[Y]ou are actually doing a HEROIC job – everyone thinks so. Many, many thanks."). Dr. Overall approached Dr. Smith to discuss her desire to obtain a tenured faculty position, her problems with her residents and staff, and other administrative concerns. This friendship prompted several University insiders to suggest that Dr. Smith was Dr. Overall's personal champion within DCS.

In April 1999, Dr. Smith announced that the Veterinary School would create five new "Clinical Educator" positions on the Penn faculty. One of these would be in Dr. Overall's field of expertise, behavioral veterinary medicine.[1] Although Clinical Educators are not eligible for tenure, they are typically awarded longer term contracts than Lecturers like Dr. Overall, and the positions are considered more prestigious. Based on Dr. Smith's friendship with Dr. Overall and her apparent interest in the job, many within the Department surmised that Dr. Smith created the position specifically for Dr. Overall. See App. at 490-91.

Despite these rumors, Dr. Smith followed protocol and set up a Faculty Search Committee with five members, three of whom had experience with behavioral veterinary medicine. See App. at 447-49. Dr. Smith charged the Committee with the task of picking the best qualified candidate from all the applicants. App. at 386, 483 (Dr. Smith told the Committee that he wanted a "real" search versus a "sham" search that simply gave the job to Dr. Overall).

The Committee had the authority to make recommendations, but Dr. Smith retained the power to ignore or veto any recommendation, with or without cause. See App. at 244,

---

[1]This relatively new field studies the behavior of dogs, cats, and other domestic animals. It focuses on methods for diagnosing and treating behavioral problems, such as biting and constant scratching.

385-86. Nevertheless, it is common practice at Penn for department chairs to follow the recommendations of their hiring committees. In fact, in some departments, it is apparently considered a "sort of administrative suicide" for a chair not to follow the faculty's advice in hiring. See App. at 244, 496-97. Dr. Overall's husband, a Penn faculty member for more than 20 years, stated in a deposition that "in our department, the chair never would override the decision [of the faculty]." App. at 502. Dr. Overall produced no evidence that any chair has ever overruled a hiring committee in the Veterinary Medicine Department.

Upon learning of the new Clinical Educator position, Dr. Overall applied and asked Dr. Smith to "put odds" on her application. He responded: "I'll work it out." App. at 129-30. At the time of this discussion, Dr. Overall was not aware that Dr. Smith technically had the authority to overrule the Search Committee's decision.[2]

The Search Committee did not share Dr. Smith's confidence in Dr. Overall. It unanimously rejected her candidacy twice, first in a May 22, 2000, interim report, and then again in a September 15, 2000, final report. Both times, the Committee provided non-discriminatory reasons for its decision not to recommend Dr. Overall. It acknowledged her strengths but also cited serious reservations about her "history of unsuccessful interpersonal interaction," her "questioned integrity," and "a poisoned atmosphere which pits Karen against her staff." App. at 7 n.3. Dr. Smith elected not to overrule these recommendations.

Over the period of one year, the Search Committee considered six candidates, five females and one male. Its final

---

[2]The District Court credited Dr. Overall's deposition testimony that she "did not know what role the department chair played in the search committee decision." App. at 5-6 n.2, 24 n.14. It chose to disregard portions of a later-submitted affidavit that directly contradicted this statement. See Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703, 706 (3d Cir. 1988) (endorsing the sham affidavit doctrine).

4

recommendation was in favor of Dr. Ilana Reisner, a woman. Once Penn hired Dr. Reisner for the job that Dr. Overall desired, Dr. Smith revoked Dr. Overall's clinical privileges, based on an agreement that they had allegedly made earlier.[3] When Dr. Overall continued working at the clinic, Dr. Smith confronted her and demanded that she not return. In March 2001, after reports that files were missing from the clinic, padlocks were placed on the clinic door. Dr. Overall says she was not able to return to the clinic, even to gather her personal belongings. She also alleges that her mail was not forwarded. Dr. Smith claims that he knew nothing about this.

On November 15, 2000, Dr. Overall instituted a proceeding under the University's Faculty Grievance Procedure, alleging gender discrimination, among other things. Dr. Smith testified in connection with this grievance, giving unsworn testimony that provided the basis for Dr. Overall's subsequent defamation claims. He made three allegedly defamatory statements. First, he stated that it was "common knowledge" that Overall was represented in publications as having a Ph.D. years before she actually received one. Second, he claimed that Overall represented numerous articles in her CV as "peer reviewed," even though they were allegedly not peer reviewed, as that term is understood in academia. Finally, Dr. Smith suggested that Dr. Overall misused grant funds earmarked for clinical work. Ultimately, the University and Dr. Smith were found innocent of any wrongdoing.

Unsuccessful in her grievance proceeding, Dr. Overall filed a claim with the Pennsylvania Human Rights Commission ("PHRC") and cross-filed with the Equal Employment Opportunity Commission. The PHRC elected not to take action in her case, issuing a Right to Sue letter on December 27, 2001.[4] Dr. Overall's

_____

[3]The District Court found that Dr. Smith and Dr. Overall agreed that she would have a "terminal appointment for the year beginning on July 1, 2000 [that] would extend only until the Search Committee had reached a decision." App. at 8.

[4]Two months later, Overall filed a complaint in state court, alleging six causes of action. See App. at 149-165. In July 2001,

5

federal complaint asserted 11 causes of action. The District Court granted summary judgment in favor of Penn on all counts. Overall v. Univ. of Pennsylvania, 2003 WL 23095953 (E.D. Pa. Dec. 19, 2003).

## II.

Dr. Overall raises four issues on appeal. She maintains that the District Court erred when it granted summary judgment in Penn's favor on the defamation, fraudulent misrepresentation, retaliation, and employment discrimination claims. We address each in turn.

## A.

We turn first to the defamation issue. The District Court found that all of Dr. Smith's allegedly defamatory remarks took place "during Penn's internal grievance proceedings relating to Dr. Overall's discrimination claims." Overall, 2003 WL 23095953 at *9. Quoting Binder v. Triangle Publ'ns, 275 A.2d 53, 56 (Pa. 1971), the District Court correctly noted that "[a]ll communications pertinent to any stage of a judicial proceeding are accorded an absolute privilege which cannot be destroyed by abuse." Acknowledging that Penn's internal grievance proceedings were not actually judicial, the District Court held that they were "quasi-judicial" and therefore entitled to the same absolute immunity as regular judicial proceedings.

In reaching this conclusion, the District Court relied on the Pennsylvania Superior Court's decision in Milliner v. Enck, which states:

> The "judicial proceeding" wherein absolute privilege

_____

the Court of Common Pleas dismissed her fraudulent misrepresentation claim, among others, for failure to state a claim upon which relief can be granted. Dr. Overall then filed a Praecipe to Discontinue the State Action, and brought suit in federal court.

6

attaches has not been precisely defined in our Commonwealth. However, it has been defined to include any hearing before a tribunal which performs a judicial function, including many administrative officers, boards and commissions, so far as they have the powers of discretion in applying the law to the facts which are regarded as judicial or "quasi-judicial" in character.

709 A.2d 417, 419 n.1 (Pa. Super. Ct. 1998). The District Court translated this language into a rule that <u>any</u> proceeding that applies facts to law deserves "quasi-judicial" status. It wrote:

> In this case, the purpose of the grievance proceedings was to gather the facts and determine whether those facts supported Dr. Overall's claim for discrimination and harassment. If the facts had supported Dr. Overall's claims, Dr. Smith would have been disciplined. This application of the facts to Dr. Overall's claims was clearly quasi-judicial in character. Therefore, the statements made by Dr. Smith during the grievance proceedings are absolutely privileged.

<u>Overall</u>, 2003 WL 23095953 at *9.

The District Court misapprehended the essence of quasi-judicial proceedings. While "applying law to facts" is undeniably an attribute of such proceedings, our research reveals that under Pennsylvania law government involvement is also a necessary condition for according quasi-judicial status to grievance procedures.

We have not found a single Pennsylvania case according quasi-judicial status to entirely private hearings. Rather, Pennsylvania cases finding quasi-judicial privilege consistently involve proceedings before federal, state, or local governmental bodies, or proceedings held pursuant to a statute or administrative regulation. <u>Milliner</u> is instructive on this point. In a lengthy footnote, the Pennsylvania Superior Court cites – apparently with

7

approval – no fewer than 13 cases discussing quasi-judicial entities. Without exception, each involves a grievance proceeding before a government entity or an ostensibly private entity operating pursuant to a state or federal statute.[5]

Secondary sources referenced in Pennsylvania quasi-judicial privilege cases bolster this conclusion. Every case cited in the leading torts treatise involves a government entity of some sort.[6] The Restatement (Second) of Torts explains that quasi-judicial privilege should be extended to

> any person acting as a judge of a court, whether of general or limited jurisdiction. It is also applicable to any other official, judicial or otherwise, who performs a judicial function, such, for example, as a master in chancery, a referee in bankruptcy, a

---

[5]See, e.g., LaPlante v. United Parcel Service, Inc., 810 F. Supp. 19, 21 (D. Me. 1993) (Maine Human Rights Commission); Magan v. Anaconda Indus., 429 A.2d 492, 494-96 (Conn. Super. Ct. 1980) (Connecticut employment security division); Stiles v. Chrysler Motors Corp., 624 N.E.2d 238, 242 (Ohio App. 1993) (auto worker's grievance proceeding pursuant to the National Labor Relations Act); Shortz v. Farrell, 193 A. 20, 21-22, 24 (Pa. 1937) (Workmen's Compensation Board); Urbano v. Meneses, 431 A.2d 308, 309 (Pa. Super. Ct. 1981) (Upper Merion Township zoning board); Story v. Shelter Bay Co., 760 P.2d 368, 370-71 (Wash. Ct. App. 1988) (Land Sales Enforcement Division of the Department of Housing and Urban Development).

[6]See Page Keeton et al., Prosser & Keeton on Torts § 114, at 818-19 (5th ed. 1984) (citing cases discussing proceedings before, e.g., a New York court; civil service boards; industrial boards; tax boards of appeals; state labor commissions; insurance commissions; Civil Aeronautics Board; numerous administrative proceedings to revoke licenses (e.g., liquor, dairy, insurance); state revenue commissions; insurance commissions; state housing rent commissions; investigating committees of aldermen; departmental hearings before police superintendent; zoning board of appeals; Ohio State Board of Embalmers).

> member of a military tribunal or the governor of a State of the United States engaged in an extradition hearing.

Restatement (Second) of Torts § 585. Each example in this passage involves a government actor. The Restatement goes on to discuss other "governmental agencies" that sometimes perform quasi-judicial functions, such as "public utility commissions and utility boards." Id. It concludes that "[i]t is immaterial whether the body of which the judicial officer is a member is created by the constitution or by statute." Id. Implicit in this rule is the assumption that the "judicial officer" must be a public official.[7]

Unlike all of the cases cited above, the present case involves an entirely private grievance procedure. No state or federal statute authorized it, and no public officials presided over it. Nor was it the product of a collective bargaining agreement. Furthermore, the defendants could not point to any case, in Pennsylvania or elsewhere, that involved an entirely private proceeding akin to the one at issue here.[8]

---

[7]See also Restatement (Second) of Torts, Reporter's Note to § 585 cmt. b (citing dozens of additional public tribunals deemed quasi-judicial). The only other type of proceeding deemed quasi-judicial is a grievance proceeding arising under a collective bargaining agreement, which is governed by the Fair Labor Standards Act.

[8]Defendant argues that Walker v. Gibson, 633 F. Supp. 88, 90 (N.D. Ill. 1985), stands for the proposition that statements before a "grievance committee" are entitled to absolute privilege. But the proceedings in that case "were convened pursuant to 5 C.F.R. § 771, with Examiner John M. Stewart, of the United States Army Civilian Appellate Review Agency, as the presiding officer." Id. By statute, Examiner Stewart "had the discretion to review the evidence and examine the witnesses, reach a conclusion, and prepare a report." Id. Since the hearing was conducted pursuant to a federal regulation and involved a public official, it is readily distinguishable from the private grievance procedure at issue in this case.

Sound reasons exist for this public-private distinction. Government hearings typically involve basic procedural safeguards that may be lacking in private proceedings. For example, the Penn grievance procedure at issue here did not require sworn testimony. The volunteer faculty members who presided over the hearing lacked the power to make any binding judgment or enforce any disciplinary measures; they could only make recommendations. And of particular relevance to this case, no one kept a transcript of what was said during the hearing, so there is no record of exactly what Dr. Smith said when he allegedly defamed Dr. Overall.

Pennsylvania of course is free to set the scope of its quasi-judicial privilege as it wishes, but we have found absolutely no support for the argument advanced in this case by the University of Pennsylvania. We agree with the Restatement that "the fact that an official or board is required to find facts as a basis for its action does not of itself make the function of the official or board judicial," and hold that the District Court erred in deeming Penn's procedure quasi-judicial. Restatement (Second) of Torts, § 585 cmt. b. We therefore reverse the entry of summary judgment in favor of Penn on Dr. Overall's defamation claim and remand for further proceedings.

B.

Dr. Overall next claims that Dr. Smith committed fraudulent misrepresentation when he said "I'll work it out," in response to her request to "put odds" on her application. We disagree.

Under Pennsylvania law, fraudulent misrepresentation has six elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

10

<u>Gibbs v. Ernst</u>, 647 A.2d 882, 889 (Pa. 1994) (footnote and citations omitted). Dr. Overall cannot meet all six elements.

The District Court properly found that Dr. Overall could not have reasonably relied on Dr. Smith's statement. First, Dr. Overall's question did not invite a promise. A request to "put odds" on a certain event asks that someone weigh the likelihood that the event will occur in the future. Even here, where Dr. Smith had significant control over the final decision, Dr. Overall's request was different in kind from saying "Do you promise to give me this job?" Second, Dr. Smith's response also fell short of a straightforward promise. A more reasonable interpretation of it would be that Dr. Smith would do all he could within reason to help Dr. Overall's candidacy along. This becomes an even more natural interpretation when one considers that Dr. Smith made this remark at a very early stage in the hiring process: the Committee did not release its <u>interim</u> report until almost a full year later.

Even if Dr. Smith's representation constituted a promise, Dr. Overall still could not have reasonably relied on it. As the District Court noted, when the statement was made, Dr. Overall did not know that Dr. Smith had the authority to overrule the Hiring Committee. <u>Overall</u>, 2003 WL 23095953 at *11. If, as Dr. Overall claims, she later investigated further and discovered that Dr. Smith had that power, she also would have learned that department chairs often suffer serious political repercussions when they ignore a hiring committee's recommendation.[9] It was thus unreasonable for Dr. Overall to assume that Dr. Smith's representation would remain binding no matter what happened during the hiring process.

---

[9]She also would have seen that Dr. Smith's license to ignore the Committee's decision does not give him free rein over the hiring process. The record reveals that Dr. Smith's hiring choice had to be approved by an additional five layers of bureaucracy before it became official. <u>See</u> App. at 245-46. There is some indication – admittedly by Dr. Smith himself – that these layers are not mere "rubber stamps." <u>Id.</u>

11

C.

Dr. Overall's two remaining claims do not require lengthy discussion. On the retaliation claim, Dr. Overall engaged in protected activity when she filed her grievance with Penn on November 15, 2000. But the main adverse employment action on which she relies was the University's decision to revoke her clinical privileges, which occurred on October 23 – three weeks before she filed her University grievance. See App. at 19. Nothing in the record indicates that Dr. Overall threatened to file her grievance before that date. Since she cannot prove a causal connection between her participation in a protected activity and an adverse employment action, her retaliation claim must fail. See Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).

On appeal, Dr. Overall argues that "substantial retaliation" took place after she filed her grievance. She points to incidents in which Dr. Smith allegedly "berated" her in her office in the presence of witnesses on November 1, 2000; placed a padlock on the clinic door in March 2001; and then defamed her in June 2001. Assuming for the sake of argument that these incidents amount to "adverse employment actions," Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997), there is no proof of a causal link between any of these activities and Dr. Overall's filing of a grievance. The November 1 incident occurred the day after Overall's clinical privileges were suspended. The record shows that Smith was "berating" Overall for contravening the terms of her suspension. The padlock was placed on the clinic because items were missing from it. And, finally, Dr. Smith made allegedly defamatory remarks at the grievance proceeding to explain why he did not override the Search Committee's decision against recommending Dr. Overall.

Dr. Overall's final claim is gender discrimination. The District Court could not "find any evidence that gender motivated Dr. Smith's decision." App. at 13. In fact, it found that "Dr. Smith appears to have been more supportive of Dr. Overall than were the members of the search committee." App. 13-14. We agree. The record is devoid of any credible evidence that Dr. Smith chose not to override the Committee's decision because of Dr. Overall's

12

gender. In fact, the record is replete with evidence that Dr. Overall's candidacy had drawbacks so significant that even her personal champion in the Department felt compelled to abide by the Committee's decision.

III.

For the foregoing reasons, we affirm the District Court's entry of summary judgment in favor of Penn on the fraudulent misrepresentation, retaliation, and employment discrimination claims, but we reverse the entry of summary judgment on the defamation claim, and remand for further proceedings on that claim.