Christian **BOURIEZ**; Montanelle Beheer, Appellants

v.

**CARNEGIE MELLON UNIVERSITY.**

No. 07–3876.

United States Court of Appeals, Third Circuit.

Argued Oct. 1, 2008.

Filed: Oct. 26, 2009.

John R. Gall, Esq. (Argued), Philomena M. Dane, Esq., Christopher F.W. Haas, Esq., Kristen M. Blankley, Esq., Squire Sanders & Dempsey, L.L.P., Columbus, OH, John M. Von Mehren, Esq., Squire Sanders & Dempsey, L.L.P., Cleveland, OH, for Appellants.

George E. Yokitis, Esq. (Argued), Walter P. DeForest, Esq., Mindy J. Shreve, Esq., DeForest Koscelnik Yokitis, Kaplan & Berardinelli, Pittsburgh, PA, for Appellee.

Before: FISHER, CHAGARES, and HARDIMAN, Circuit Judges.

## OPINION OF THE COURT

CHAGARES, Circuit Judge.

Christian Bouriez and Montanelle Beeher, B.V. (collectively referred to as "Bouriez") appeal the District Court's grant of summary judgment in favor of Carnegie Mellon University ("CMU") with respect to Bouriez's fraudulent misrepresentation and negligent misrepresentation claims. The issue on appeal is whether the District Court erred in concluding that Bouriez failed to establish that CMU proximately caused Bouriez's losses.[1] Because we con-

---

1. The parties also dispute whether an Arbitrator's findings in a related proceeding are now binding on CMU. This issue is not germane to this appeal, however, because the District Court assumed that the Arbitrator's decision is binding, but still granted CMU's motion for summary judgment. Because the collateral estoppel issue does not affect the outcome of

clude that the District Court's proximate cause analysis was in error, we will vacate the grant of summary judgment to CMU and remand for further proceedings consistent with this opinion.

## I.

We state the facts in the light most favorable to Bouriez. Carnegie Mellon Research Institute ("CMRI") was an unincorporated, non-academic, organizational unit of defendant CMU. CMRI was engaged in scientific research and development for government agencies and industrial entities whom CMRI called "sponsors."

In July 1997, an entity called Governors Refining Technologies, LLC ("GRT") and a related entity, Governors Technologies Corporation ("GTC") (collectively referred to as "Governors"), agreed to sponsor a microwave-enhanced catalytic cracking project that CMU had been developing. "[T]he primary goal of this project [was] to demonstrate an efficient process that uses suitable catalysts in conjunction with microwaves to selectively crack hydrocarbons." Joint Appendix (J.A.) 332. The term "cracking" refers to the breaking down of "heavier hydrocarbons into lighter hydrocarbons of a more useful range." *Id.* If successful, microwave heating would have provided a better alternative to traditional heating methods that "use large quantities of energy," and would have "reduce[d] the environmental impact of industrial waste." J.A. 326. Governors agreed to fund CMU's development of microwave technology in exchange for the right to

license any technology developed. Governors had no assets except the rights to the technology.

Plaintiff Christian Bouriez is an investor who resides in London, England. Plaintiff Montanelle Beeher, B.V. is an entity incorporated and owned by Bouriez. Bouriez traveled to Pittsburgh to learn about the work being done by CMRI under Governors' sponsorship. Governors provided Bouriez with a Business Plan and a Project Plan written by CMRI. Bouriez also met with CMRI and Governors representatives on three occasions in 1999. CMU's Business Plan emphasized its good name and scientific expertise in microwave technology. J.A. 369–72.

In encouraging Bouriez to invest in microwave technology, CMU presented him with a document entitled "Proposal for a Project Plan for Microwave Enhanced Catalytic Processing" (hereinafter "December 11 Proposal"). J.A. 362. CMU gave this same document to Governors earlier to obtain Governors' investment. *See* J.A. 325. In the December 11 Proposal, CMU represented, *inter alia*, that certain technological improvements have been "demonstrated" and that CMRI reached the "proof of concept"[2] stage of development for the technology. J.A. 329. The December 11 Proposal also listed several purported "microwave enhancements" that CMRI had "proven." J.A. 330. In addition, Bouriez indicated during his deposition that Alberto Guzman, the Assistant Director of the CMU division undertaking the microwave project, told him that

---

this appeal, we express no opinion with regard to that dispute.

**2.** The parties dispute the exact definition of "proof of concept." Bouriez claims that "proof of concept" is a scientific term that typically connotes the development of a process to a point that would support commer-

cialization. At the arbitration, CMU's expert testified that "proof of concept" meant that one had an hypothesis and had "proved" it, and that "proof" means one can predict results. Another CMU witness testified that "proof of concept" meant that one could use microwaves and a catalyst to crack a pitch.

"proof of concept had been established. I understood from Mr. Guzman that this technology was working. I understood that this technology was feasible. I understood that this technology was commercially viable." J.A. 361.

Furthermore, in a presentation to Bouriez in July 1999, CMU indicated that the data-collection phase of its research would be completed within six months and that the commercialization phase would begin approximately two years thereafter. J.A. 375. In a later presentation, CMU provided financial projections estimating that Governors would generate $37.5 million in profits by the year 2003, based on the then-current state of the research. In a letter, Guzman claimed that these projections were "good and conservative." J.A. 383, 387.

On October 5, 1999, Bouriez signed two written agreements: the "Share Purchase Agreement" and the "Shareholders Agreement." J.A. 930. Pursuant to these agreements, Bouriez invested $5 million in Governors to fund the work being done by CMRI under Governors' sponsorship. In exchange, Bouriez received 6.25 million shares of Governors' stock, which he still owns. The price of these shares was based entirely on the potential value of Governors' contract with CMU and the microwave technology that it was funding. Bouriez's expert concluded that besides its contract with CMU, Governors had no other significant assets or means of achieving profit. J.A. 411. Moreover, the Share Purchase Agreement explicitly stated that Governors had no other assets and that no public market existed for its shares. J.A. 727. Prior to investing in Governors, Bouriez did not retain an independent advisor with microwave or petroleum processing expertise to evaluate the microwave technology that CMRI claimed to have developed. J.A. 355 ("I relied on what people of CMRI told me [in making the investment].").

In September 2000, Bouriez and CMRI learned that Governors was out of money. CMRI and Bouriez were also told that two officers of Governors had diverted approximately $1.35 million of the funds invested by Bouriez to pay for a debt unrelated to the work being done by CMRI. J.A. 931. The two officers diverted this money without authorization of Governors' Board of Directors. Id. It remains unclear, however, whether the diverted money actually included any of Bouriez's investment because CMU acknowledged that Governors had many other investors whose money could have comprised the diversion. J.A. 593 ("We admitted that we were informed of the diversion. We don't know that it was Mr. Bouriez's money. All we know is that GTC's money was diverted to another company; that money that was to go to pay us for the project.").

On December 4, 2000, CMRI stopped working for Governors because it was not paid amounts that Governors allegedly owed. J.A. 931. CMU directly solicited an additional investment from Bouriez, however. J.A. 248–49. Bouriez was prepared to make another investment, but this time decided to obtain an independent audit first. J.A. 79–81. Contrary to CMU's representations, the independent auditor concluded that "proof of concept of microwave enhancement effect in catalytic cracking of hydrocarbons did not exist [in summer 1999]." J.A. 1010. The independent auditor further concluded that "the microwave enhancement effect was not [proved] in 2001 and it is not today." Id.

Bouriez's trial expert agreed with these findings: "In reality all of the information available suggests that CMU was still very much in the ideation stage in late 1999, even after three years of sporadic activity in the area of microwave processing of

hydrocarbon streams." J.A. 401. The expert also concluded that CMU never subsequently established "proof of concept." J.A. 402. Furthermore, David Purta, the lead scientist on the microwave project, admitted during his deposition that CMU had not "developed a technology ... that could achieve the same results as conventional catalytic cracking processes at environments of lower temperatures." J.A. 390.

Bouriez instituted this action against CMU in December 2002, alleging fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment. On January 30, 2003, CMU filed an arbitration demand against, *inter alia,* Bouriez and Governors. CMU moved the District Court to compel Bouriez to join that arbitration. The District Court granted CMU's motion, but this Court reversed, holding that because "Bouriez's claims deal with his shareholder agreement, and not the 1996 Agreement" defining the contractual relationship between Governors and CMU, "Bouriez was one step removed from the 1996 Agreement and, therefore, is not equitably estopped from avoiding the arbitration clause contained in that Agreement." *Bouriez v. Carnegie Mellon Univ.,* 359 F.3d 292, 295–96 (3d Cir.2004).

After the parties in this case completed discovery and were awaiting trial, the Arbitrator issued an Opinion and Final Award in favor of Governors and against CMU, concluding that CMU falsely repre-

sented to Governors that its microwave technology worked.[3] The Arbitrator ordered CMU to pay Governors $9,935,490.08 in rescissory damages, interest, costs, and fees. CMU declined to appeal the Arbitrator's decision and satisfied the award.

Thereafter, Bouriez and CMU filed cross motions for summary judgment. Bouriez argued that the Arbitrator's findings were binding through collateral estoppel and that those findings established each element of his claims. CMU asserted that because it had satisfied the arbitration award to Governors, Bouriez could not prove any damages caused by CMU's alleged misrepresentations. Bouriez responded that his claims for fraudulent misrepresentation and negligent misrepresentation were still valid because Governors was in the process of dissolving and Bouriez argued that he would not get his full $5 million investment back. Specifically, Bouriez expected to receive only approximately $2.15 million of the arbitration award upon Governors' dissolution because: (1) approximately $2.25 million of the arbitration award went towards paying Governors' legal fees, (2) Governors must satisfy legitimate business expenses before dissolution, and (3) Bouriez only owns 23 percent of Governors' stock. J.A. 345, 349, 589–90. Bouriez also, however, withdrew his unjust enrichment claim, acknowledging that CMU's rescission of all

---

**3.** Specifically, the Arbitrator concluded that CMU was liable for breach of contract and negligent misrepresentation: "GRT has proved by a preponderance of the evidence that CMRI did not have an adequate basis to represent that it had 'proved' or 'demonstrated' what it claimed in the ... [December 11] Proposal." J.A. 272. CMRI therefore "failed to deliver the most basic consideration it was to deliver in return for the monies to be provided by GRT," and CMU had "breached its agreement with GRT in such a fundamen-

tal manner as to constitute a failure of consideration and, therefore, rescission is appropriate." *Id.* Moreover, the Arbitrator found that "even if GRT would not have been entitled to rescission based on its breach of contract theory, it is entitled to rescission on its negligent misrepresentation claim," J.A. 279, because CMU had a "confidential relationship" with Governors and therefore had an affirmative duty of "full and frank disclosure," which it breached, J.A. 277–78.

funds it received in connection with the investment in microwave technology terminated this claim. J.A. 562.

The District Court granted CMU's motion and denied Bouriez's motion, holding that Bouriez failed to offer evidence that CMU's misrepresentations proximately caused his damages beyond a share of the arbitration award. Specifically, the District Court held that because Bouriez's claims are based on "those 'very same misrepresentations,'" they

> caused the "very same damages" to both Governors and Plaintiffs, and those damages, as measured by the Arbitrator, are the *full amount of monies* Governors had invested with CMU pursuant to the rescinded agreement, which monies CMU has already paid back in full, with interest. Thus CMU has disgorged to Governors *all monies invested by Plaintiffs* that were passed through Governors to CMU for use on the Project.

*Bouriez v. Carnegie Mellon Univ.*, No. 02–cv–2104, 2007 WL 2492735, at *12 (W.D.Pa. Aug.30, 2007) (emphasis in original).

The District Court rejected Bouriez's argument that CMU caused "some independent injuries or damage to" him, or that his "damages were somehow distinct from Governors' damages." *See id.* The District Court concluded that

> Plaintiffs may have "lost $5 million" but not "as a result" of CMU's misrepresentations; what was lost 'as a result' of CMU's representations was all the monies CMU was ordered to return to Governors when its agreement with CMU was rescinded, which *included* all of Plaintiffs' investment that was channeled through Governors for the Project. CMU proximately caused *exactly* all of the economic loss represented by the monies it returned to Governors.

*Id.* (emphasis in original). Finally, the District Court concluded that "[t]o the extent Plaintiffs' investment in Governors is no longer worth $5 million, Plaintiffs have not offered any record evidence to show that the entirety of any lost value is attributable to CMU's misrepresentations, rather than the $1.35 million diversion of funds by Governors' directors and other forces." *Id.*

Bouriez now appeals, arguing that the District Court incorrectly assumed that the arbitration award represented the full universe of damages caused by CMU's misrepresentations.

## II.

This is a diversity action governed by Pennsylvania law. The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because this is an action between a citizen of a State and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because this is an appeal of a final decision of a District Court.

When reviewing an order granting summary judgment, "[w]e exercise plenary review ... and we apply the same standard that the lower court should have applied." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir.2000). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, we "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell*, 206 F.3d at 278 (quotation marks and citation omitted). "There must, however, be suffi-

cient evidence for a jury to return a verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994). "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992).

Where the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried this burden, the burden shifts to the nonmoving party to point to sufficient cognizable evidence to create material issues of fact "such that a reasonable jury could find in its favor." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir.2007) (citing Fed.R.Civ.P. 56(e)).

### III.

■ Under Pennsylvania law, a fraudulent misrepresentation claim has six elements:

"(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."

*Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir.2005) (quoting *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994)). A negligent misrepresentation claim has four elements:

(1) a duty recognized by law, requiring the actor to conform to a certain standard of conduct for protection of others against unreasonable risks; (2) failure to conform to the standard required; (3) a causal connection between the conduct and resulting injury; and (4) actual loss or damage resulting to interests of another.

*Colacicco v. Apotex, Inc.*, 432 F.Supp.2d 514, 554 (E.D.Pa.2006). Thus, proximate cause is an essential element of both fraudulent misrepresentation and negligent misrepresentation claims. *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 445 (3d Cir.2000).

■ The central issue in this appeal is whether Bouriez has presented evidence sufficient to create a genuine issue of material fact as to whether CMU proximately caused the loss of his investment in Governors. Proximate cause is a question of law to be decided by the trial court. *Holt v. Navarro*, 932 A.2d 915, 921 (2007). The court must ascertain whether a defendant's acts or omissions were a "substantial factor" in bringing about the plaintiff's harm. *First v. Zem Zem Temple*, 454 Pa.Super. 548, 686 A.2d 18, 21 n. 2 (1996). In making this determination, Pennsylvania courts apply the factors listed in Restatement (Second) of Torts § 433:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

*See, e.g., Brown v. Phila. College of Osteopathic Med.*, 760 A.2d 863, 869 (2000)

(quoting and relying on Restatement (Second) of Torts § 433).

Bouriez argues that the District Court misapplied the "substantial factor" test because it focused on the wrong loss. We agree. Referencing § 433(a) of the Restatement, the District Court held that the existence of "other factors," such as the $1.35 million diversion of Bouriez's funds, was clear. It then looked at *the shortfall* between Bouriez's investment in Governors and the distribution Bouriez will receive after Governors' dissolution. The Court held that CMU's misrepresentations were not a "substantial factor" in causing *the shortfall,* attributing it to the diversion and "other factors" instead. Accordingly, the District Court concluded that CMU was entitled to summary judgment because Bouriez failed to establish that CMU proximately caused his loss.

In assessing proximate cause, however, the relevant question is not whether CMU's misrepresentations were a "substantial factor" in causing *the shortfall,* but whether they were a "substantial factor" in causing Bouriez's *failed investment* in Governors. This is because the entire $5 million failed investment is the relevant injury for the purpose of analyzing proximate cause in this case. By emphasizing, instead, the difference between Bouriez's investment in Governors and the distribution Bouriez will receive after Governors' dissolution, the District Court focused on potential damages in this case, rather than on the injury. Only the latter is relevant to the proximate cause inquiry, for although the actions of a third party or other forces can mitigate or even eliminate the ultimate damages award, those forces do not change the fact of the initial injury and the cause of that injury. As discussed below, a correct application of the "substantial factor" test precludes the grant of summary judgment to CMU.

Bouriez produced sufficient evidence to raise a genuine issue of material fact as to whether CMU's misrepresentations were a "substantial factor" in causing his failed investment in Governors. Although § 433 of the Restatement instructs courts to consider the effect of "other factors" on a plaintiff's alleged injury, it is well established that a "substantial factor need not be ... the only factor" in bringing about the relevant harm. *Jefferson Bank v. Progressive Cas. Ins. Co.,* 965 F.2d 1274, 1284 (3d Cir.1992) (quotation marks and citations omitted). Applying the "substantial factor" analysis under § 433 of the Restatement, and concentrating on the relevant loss, we hold that Bouriez presented sufficient evidence that CMU's misrepresentations induced his investment, and the revelation of the misrepresentations caused the investment to become worthless. *Cf. Moffatt Enters., Inc. v. Borden Inc.,* 807 F.2d 1169, 1176 (3d Cir.1986) (reversing a grant of summary judgment to defendant on causation grounds where "plaintiffs have presented evidence sufficient to support a finding that they justifiably relied to their detriment upon [defendant's] alleged misrepresentations" in entering into distributor agreement with defendant).

Specifically, Bouriez presented evidence that CMU made representations directly to him that its microwave technology actually worked. For example, in the December 11 Proposal, CMU stated that the technology was "proven," had been "demonstrated," and that it established the "proof of concept." Bouriez also introduced evidence that the potential value of CMU's technology was the only basis for Bouriez's investment in Governors, because Governors' contract with CMU was the sole potential means for Governors to have any value or to be profitable. Next, Bouriez proffered evidence that CMU's

technology did not work and has never worked. This was the conclusion of Bouriez's expert and an independent auditor that Bouriez hired. Bouriez's expert also concluded that Bouriez's investment was rendered worthless as soon as CMU's misrepresentations were revealed because the entire value of Bouriez's investment depended on the viability of CMU's technology. Thus, no "lapse of time" existed between the revelation of the misrepresentations and Bouriez's loss.

 Although CMU and the District Court point to the presence of "other factors," such as the alleged diversion of Bouriez's funds, the above evidence, at a minimum, establishes a genuine issue of material fact that CMU's misrepresentations were at least one substantial factor in causing the initial injury to Bouriez. *See Jefferson Bank*, 965 F.2d at 1284 (" 'Pennsylvania law has long recognized that this substantial factor need not be ... the only factor ....' " (quoting *Jones v. Montefiore Hosp.*, 494 Pa. 410, 431 A.2d 920, 923 (1981))). Notably, even deducting the alleged diversion of $1.35 million from the $2.85 million "shortfall" leaves another "shortfall" of $1.5 million. CMU has not offered a cause for this shortfall; it simply attributes it to "other factors." Such vague references to other contributing forces are insufficient to validate the District Court's proximate cause analysis; CMU's argument merely raises a "superseding cause" defense.[4]

Finally, we note that CMU's satisfaction of the arbitration award is relevant to the present lawsuit, but only to the extent that it mitigates Bouriez's damages. Governors' dissolution prevents the return of Bouriez's full investment because Governors must first pay its legal fees[5] and business expenses. The remaining funds must be distributed proportionally

**4.** A "superseding cause" is an intervening force that is "so extraordinary as not to have been reasonably foreseeable." *Chacko v. Commonwealth Dep't of Transp.*, 148 Pa. Cmwlth. 494, 611 A.2d 1346, 1349 (1992) ("Among the factors to consider in determining whether a subsequent force is an intervening or superseding cause are whether the force is operating independently of any situation created by the first actor's negligence and whether it is or is not a normal result of that situation.") (citing Restatement (Second) Torts § 442(c)). Importantly, the *defendant* bears the burden of proving the existence of any superseding cause. *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 421 (3d Cir.2006). Moreover, "[i]t is for a jury to determine whether an act is so extraordinary as to constitute a superseding cause." *Feeney v. Disston Manor Pers. Care Home, Inc.*, 849 A.2d 590, 595 (2004); *see also Frey v. Smith*, 454 Pa.Super. 242, 685 A.2d 169, 173 (1996) ("[W]hat the original actor should have realized and what a reasonable man would say was highly extraordinary are, of course, fact questions which must in the majority of the cases be left to the jury." (citation and quotation omitted)).

Because the question of whether the diversion of Bouriez's funds—or "other factors"—"was so extraordinary as not to have been reasonably foreseeable," as well as the question of "reasonableness" itself, are normally left to the jury, these issues are not typically resolved at summary judgment. *Feeney*, 849 A.2d at 595 (quotation marks and citation omitted); *Frey*, 685 A.2d at 173. Perhaps recognizing this, CMU did not raise a "superseding cause" defense on appeal. We therefore do not consider whether the alleged diversion or "other factors" constitute a superseding cause that relieves (or partially relieves) CMU from liability. At this time, we merely hold that Bouriez has presented sufficient evidence to defeat CMU's motion for summary judgment.

**5.** CMU argues that Governors' legal fees are irrelevant because Bouriez is not entitled to recover legal fees. Although it is true that the American Rule precludes Bouriez from recouping the legal fees he incurs in this action, it does not prevent him from recovering the total damages—subject to mitigation—that he suffered as a proximate cause of CMU's misrepresentation. This issue requires further factual development.

amongst Governors' shareholders (Bouriez owns approximately 23 percent of Governors' shares). Thus, Bouriez only expects to receive $2.15 million of his $5 million failed investment from Governors, leaving him with a loss of $2.85 million. This distribution does not affect the $5 million injury that CMU actually caused to Bouriez, but can be used to mitigate the ultimate damages award if liability is proven.

We acknowledge that this result may make the cumulative amount of damages to Governors and Bouriez exceed the total funds that CMU received for the development of microwave technology. Contrary to the District Court's rationale, however, CMU would not be making a "double payment" if it is found liable—it would simply be compensating all injured parties harmed by its wrongful conduct. This result is fully consistent with the "proximate cause" doctrine, which is only intended to prevent liability for unforeseeable or extraordinary consequences of one's actions. *See, e.g., Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 891 (1994) (noting the importance of foreseeability to the concept of proximate cause).[6] If CMU made misrepresentations to *both* Bouriez and Governors, thus causing two separate injuries, CMU will not be able to avoid its liability to Bouriez by compensating Governors for its separate loss.

**6.** The District Court also relied heavily on securities cases to support its proximate cause analysis. We hold that these cases, though relevant, do not support the District Court's conclusion. Proximate causation is analogous to the concept of "loss causation" in the securities context. To prove "loss causation," a plaintiff must show that "the revelation of [the defendant's] misrepresentation or omission was a *substantial factor* in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *McCabe*, 494 F.3d at 425–26 (emphasis added). Like the concept of "proximate cause"

## IV.

For the foregoing reasons, we will vacate the District Court's grant of summary judgment in favor of CMU, and will remand the case for further proceedings consistent with this opinion.

in common law fraud cases, "[t]he loss causation requirement limits the circumstances in which an investor can sue over a failed investment, so that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with the investment." *Id.* at 425 n. 3. Instead, liability extends only when the loss is foreseeable. *Id.* at 430–31. Here, Bouriez presented sufficient evidence to demonstrate that the revelation of CMU's misrepresentations was a substantial factor in causing his investment in Governors to lose value. See *id.* at 425–26.