NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4003
_____

PAUL GALLUP,

Appellant

v.

CLARION SINTERED METALS, INC;
HOWARD H. PETERSON; BENJAMIN F. MARZELLA

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 08-cv-00195)
District Judge:  Honorable Sean J. McLaughlin

_____

No. 11-4004
_____

JANICE CASOLO,
Individually and as administrator of the Estate of Joseph M. Casolo, Deceased,

Appellant

VALERIE ANN KELLY*

v.

CLARION SINTERED METALS INC;
HOWARD H. PETERSON; BENJAMIN F. MARZELLA

*Substituted Pursuant to 43(a)
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 08-cv-00281)
District Judge: Honorable Sean J. McLaughlin


Submitted Under Third Circuit LAR 34.1(a)
July 10, 2012

Before: FUENTES, HARDIMAN, and ROTH, *Circuit Judges*.

(Filed: July 26, 2012)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

In this consolidated appeal, Plaintiffs-Appellants Janice Casolo and Paul Gallup

challenge the District Court's summary judgment in favor of Clarion Sintered Metals, Inc.

(CSM), Howard H. Peterson, and Benjamin F. Marzella (collectively, Defendants) on

their claims of federal securities fraud. We will affirm.

I

Because we write for the parties, who are well acquainted with the case, we

recount only the essential facts and procedural history.

CSM, a producer of metal components for various industries, was incorporated in

1984 by Peterson, Marzella, and three other individuals. CSM issued two classes of

stock: (1) Class A shares, which were sold to members of the public, including Casolo's

and Gallup's now deceased spouses, at $10.00 per share; and (2) Class B shares, which

were sold to CSM's founding members at $1.00 per share. By 1997, Peterson and Marzella were the only remaining Class B shareholders, and they controlled CSM. That year, they created and have since controlled a separate entity, CSM Sales, Inc., purportedly to market CSM's products in exchange for a commission. Thereafter, they obligated CSM to pay up to seven percent of its annual revenues to CSM Sales. Peterson and Marzella pocketed most of that money. According to Casolo and Gallup, CSM Sales was a sham corporation which had no real business purpose and did not benefit CSM. Plaintiffs claim that, through the CSM Sales scheme, Peterson and Marzella diverted more than $9 million from CSM between 1997 and 2007.

Casolo and Gallup further contend that Defendants covered up the CSM Sales transactions by omitting information from financial reports distributed to Class A shareholders and by moving CSM shareholder meetings from Ridgway, Pennsylvania, to Erie to discourage participation. Specifically, instead of issuing official audited financial statements to shareholders, which would have revealed the transfer of CSM funds to CSM Sales as "Related Party Transactions,"[1] Defendants issued only "condensed

---

[1] Specifically, the disclosure contained in the audited statements but omitted from the condensed statements distributed to Plaintiffs read as follows:

> In a prior year the Company entered into a contract with a related party corporation to enhance sales and market the products of the Company as well as to control costs to the Company. A majority of the stock in the Company is owned by individuals who are the majority shareholders in the related party corporation. . . . For the years ending June 29, 2003[,] and June 30, 2002[,] the

3

financial statement[s]" to Class A shareholders. The condensed statements contained no indication of the relationship or transactions between CSM and CSM Sales, despite Pennsylvania law requiring that financial statements distributed to shareholders be prepared in compliance with "generally accepted accounting principles" (GAAP). *See* 15 Pa. Cons. Stat. Ann. § 1554(a).

Casolo and Gallup sold their shares back to CSM in April 2005 and April 2006, respectively. While they held CSM stock, neither of them reviewed any CSM financial statements, condensed or otherwise. Casolo testified at her deposition that she never "review[ed] any papers from [CSM]" and never "[saw] any financial statements issued by [CSM]." Although her husband "probably did," she did not speak with him about their CSM stock. Prior to trading in her stock, Casolo "did not know how much money [she] would be receiving" and "had no idea what [the stock] would be worth." Similarly, Gallup testified that he may have "glanced at" some CSM statements but "didn't really pay much attention to them." His wife had been "quite interested in about everything that showed up on there," but she never spoke with him about the statements or commented on them.

Casolo redeemed her shares on April 15, 2005. She testified that she believes she received a letter or telephone call after her husband's death informing her that she must

total charges for services to the Company from the related party corporation were $1,389,579 and $1,570,694 respectively . . . .

turn in her Class A stock. However, she has been unable to produce a copy of any such letter and recalls almost nothing about it. In exchange for her 1,500 Class A shares, she received $88,365.00 from CSM, or $58.91 per share.

The facts surrounding Gallup's stock redemption are nearly identical. Based on his wife's statements, Gallup believed he had to redeem their Class A CSM stock upon her death. When Gallup's granddaughter inquired as to the value of the shares, CSM offered $59.79 per share for Gallup's 1,500 shares, a total of $89,685.00. On April 7, 2006, Gallup delivered his stock to CSM in exchange for that amount. He testified that he does not know how the per-share value was calculated.

Although both Plaintiffs testified that they were pleasantly surprised when they learned how much they would be paid for their shares, they now claim that the CSM Sales scheme reduced the value of Class A shares by diminishing CSM profits. Class A shares were not traded on the open market, and their worth depended on their "book value." The "book value," in turn, was based upon CSM's finances as represented in the condensed financial statements and therefore did not reflect CSM revenues that had been paid over to CSM Sales. Casolo and Gallup were unaware of CSM Sales and the omissions from the condensed financial statements when they sold their shares.

Casolo and Gallup filed separate lawsuits in the United States District Court for the Western District of Pennsylvania, each alleging violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R.

5

§ 240.10b-5, as well as breach of fiduciary duty claims under Pennsylvania state law. On September 30, 2011, the District Court granted summary judgment in both cases for CSM, Peterson, and Marzella on the federal securities fraud claims and chose not to exercise supplemental jurisdiction over the state-law claims, dismissing them without prejudice. Plaintiffs timely appealed, and we consolidated their appeals for disposition.

## II

We exercise plenary review over the District Court's summary judgments. *E.g.*, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Summary judgment is appropriate only where, viewing the facts "in the light most favorable to the nonmoving party," *Scott v. Harris*, 550 U.S. 372, 380 (2007), there is "no genuine dispute as to any material fact," such that he is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

## III

"Section 10(b) of the Securities Exchange Act forbids (1) the 'use or employ[ment of] . . . any manipulative or deceptive device or contrivance,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of [SEC] rules and regulations.'" *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007)

(alterations in original) (quoting 15 U.S.C. § 78j(b)).  To establish a private securities

fraud claim under § 10(b) and Rule 10b-5, Plaintiffs must show: "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John*

*Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (quoting *Matrixx Initiatives,*

*Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011)) (internal quotation marks omitted);

*accord In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630–31 (3d Cir. 2011).

The District Court granted summary judgment for Defendants because Plaintiffs

had failed to create any genuine dispute as to loss causation (element six) or reliance,

sometimes referred to as "transaction causation," (element four).  Plaintiffs challenge

both findings.  Specifically, they argue that the District Court's loss-causation analysis

was flawed and that reliance should have been presumed.

Regardless of whether a case presents typical § 10(b) claims—*i.e.*, involves

securities traded on an open market and misrepresentations that precipitated market-wide

reaction—or non-typical claims, such as those at issue in this appeal, "we have

consistently required that both transaction causation and loss causation must be

established . . . and have never allowed the elements to merge." *McCabe*, 494 F.3d at 425

& n.2.  Accordingly, "[a] § 10(b) plaintiff must show both that (1) the plaintiff entered the

transaction at issue in reliance on the claimed misrepresentation or omission (transaction

7

causation) and (2) the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss (loss causation)." *Id.* at 425.

We agree with Plaintiffs that *McCabe* suggests that in order to prove loss causation they needed to show that Peterson's and Marzella's purportedly fraudulent transfers of CSM revenues to CSM Sales ("the very facts" that were omitted from the condensed financial statements)—not the omissions of those transactions from the distributed financial statements—diminished the value of their Class A shares. *See id.* at 435 ("[Section] 10(b) plaintiffs . . . must show that the *misstated or omitted facts* were a substantial factor in causing an economic loss actually incurred by the plaintiffs." (emphasis added)).

But we need not resolve whether the District Court reached the correct result as to loss causation because Plaintiffs have not shown reliance, *i.e.*, that "but for the fraudulent [omissions], [they] would not have . . . sold the securit[ies]." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001). "[W]hen considering whether a plaintiff has relied on a misrepresentation, we have typically focused on facts surrounding the investor's decision to engage in the transaction," *Halliburton*, 131 S. Ct. at 2186 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)), and "[a] plaintiff unaware of the relevant statement," as Plaintiffs were here, "[can]not establish reliance on that basis," *id.* at 2185.

We reach this conclusion in spite of the presumption of reliance established in

8

*Affiliated Ute Citizens of Utah v. United States* (*Affiliated Utes*), 406 U.S. 128 (1972).  As

the Supreme Court has explained, that case established that "if there is an *omission* of a

material fact by one with a duty to disclose, the investor to whom the duty was owed need

not provide specific proof of reliance."  *Stoneridge Inv. Partners, LLC v. Scientific-*

*Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (citing *Affiliated Utes*, 406 U.S. at 153–54).

Under this Court's interpretation, *Affiliated Utes* does not "say that the question of

reliance vel non may not be considered at all in a non-disclosure case" like this one, but

rather "only that proof of reliance is not required for recovery."  *Rochez Bros., Inc. v.*

*Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974).

> If [the] defendant is able to demonstrate that there was clearly no reliance, that
> is, that even if the material facts had been disclosed, plaintiff's decision as to
> the transaction would not have been different from what it was, then the non-
> disclosure cannot be said to have caused the subsequent loss and under the
> ordinary principles of the law of fraud, recovery should be denied.

*Id.*; *accord Thomas v. Duralite Co.*, 524 F.2d 577, 585 (3d Cir. 1975) ("The difficulty of

establishing reliance on a negative is obvious[,] and the burden of proving nonreliance

rests on the defendants.").

We hold that Defendants have satisfied their burden of proving non-reliance.  As

the District Court noted, both Casolo and Gallup testified that they did not read financial

statements and reports they received from CSM.  It necessarily follows that their

decisions to sell their shares back to CSM were entirely unaffected by the contents of

CSM's financial statements.  Even if the statements had referenced and described the

related party transactions, as the GAAP-compliant statements did, Plaintiffs would not have seen that information. Moreover, neither Casolo nor Gallup had any idea what their shares were worth before they redeemed them, and Gallup was unaware of the mechanism by which Class A share value was calculated, *i.e.*, based on "book value." Thus, Plaintiffs did not rely on the arguably misrepresented CSM revenues to decide whether or not they were satisfied with the price they would be paid in exchange for their shares.

We appreciate the fact that Plaintiffs allege serious misconduct which, if true, probably diminished the value of their Class A shares. According to Plaintiffs' evidence, Peterson and Marzella funneled CSM revenues into a shell corporation they controlled and then distributed those proceeds to themselves. But "§ 10(b) . . . does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way." *Stoneridge*, 552 U.S. at 162; *accord SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("[Section 10(b)] must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation . . . ."). "Claims grounded in breach of fiduciary duty or improper management," like those at issue here, "are not actionable under Section 10(b) or Rule 10b-5." *Werner v. Werner*, 267 F.3d 288, 299 (3d Cir. 2001) (citing *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 638–39 (3d Cir. 1990)); *see also id.* ("'[A] plaintiff may not "bootstrap" a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose the breach

10

of fiduciary duty.'" (quoting *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986))). Accordingly, Casolo's and Gallup's remedy, if any, must be based on state law, rather than the federal securities statutes.[2]

IV

For the reasons stated, we will affirm the District Court's judgment.

---

[2] As Plaintiffs point out, we have recognized that some omissions and misrepresentations that deprive plaintiffs of the opportunity to enforce state laws—*e.g.*, to enjoin a corporate merger—are *per se* material. *See, e.g.*, *Healey v. Catalyst Recovery of Pa., Inc.*, 616 F.2d 641, 648 (3d Cir. 1980) (holding that "where a minority shareholder in a merger alleges a material misrepresentation or omission by the defendant in connection with the merger that deprived him of a state law injunctive remedy, a cause of action is asserted under Rule 10b-5"). But that jurisprudence is inapplicable here for two reasons. First, Plaintiffs do not suggest that they have lost their chance to vindicate CSM's failure to provide full financial disclosures to its shareholders. Second, neither the District Court nor we have held that the omissions at issue in this case are not material. *See generally Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) ("[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information."). Rather, we conclude that, even if Plaintiffs have shown material omissions, Defendants have conclusively established that Plaintiffs did not rely on them.